**Appeal of SIMMONS & HAMMOND MANUFACTURING CO.**    Docket No. 407.

1. Expenses properly chargeable to capital account include those which are incurred in the original construction of the work and in the subsequent enlargement and improvement thereof.

2. Taxpayer purchased all the shares of its issued and outstanding stock held by three of its stockholders. It then resold these shares, so purchased, to two others of its stockholders at a price which was less than half of the price it had paid for them. *Held*, this was a capital transaction and did not result in a realized loss to the taxpayer.

Submitted January 19, 1925; decided March 17, 1925.

*Eben Winthrop Freeman, Esq.*, for the taxpayer.
*Laurence Graves, Esq.*, for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This appeal is from a determination by the Commissioner of a deficiency in income and profits taxes for the calendar years 1918, 1919, and 1920, in the amount of $19,266.12. Evidence, both oral and documentary, was offered by the parties at the hearing and from such evidence the Board makes the following

FINDINGS OF FACT.

1. The taxpayer is a Maine corporation with its principal office at Portland, Me., and is engaged in the production and sale of ice

cream. During the period under consideration the plant of the taxpayer was in property leased by it. The term of its leasehold does not appear from the record. In the year 1918 the requirements of the taxpayer's business necessitated an enlargement and improvement of its plant. An adjoining landowner was an ice company whose plant was contiguous to the plant of this taxpayer. The taxpayer secured from this ice company certain space in the latter's premises which the taxpayer could utilize by cutting through the dividing walls separating the two plants. The taxpayer could secure only a tenancy at will in this additional space just referred to. The additional space so acquired constituted about one-fourth of the entire plant space of the taxpayer after such acquisition. That is, after such acquisition the plant space which the taxpayer held under its term lease was three-fourths of the whole, while that held as tenant at will was one-fourth of the whole.

2. In the same year, 1918, the taxpayer began the overhauling, enlargement, and improvement of its plant, and expended for that purpose $5,072.83. The nature of the work done is illustrated by the following items: Cork insulation in walls, $1,871.27; tiling floors, $840; pipes and fittings, $648.94; electrical wiring, supplies, and equipment, $632.65; lumber and sheathing, $118.87; other insulation work, $280.23; constructing drains, $175.45; architects' fees, $26; waterproofing rooms, $40; freight, $69.96; labor, $249.90, unidentified, $129.56. These expenditures were evenly distributed over the entire plant of taxpayer, after its acquisition of the premises held by it as tenant at will, and it is found that of these expenditures $3,804.63 was made on the premises held by taxpayer under a term lease, and $1,268.20 was made on the premises held by it as tenant at will. In making these alterations, enlargements, and improvements certain of the old equipment was torn out and discarded as well as certain portions of the building which taxpayer was remodeling. No claim or deduction was made by taxpayer for obsolescence of such discarded property, nor was any evidence introduced at the hearing of this appeal as to the value thereof. A major portion of the expenditures referred to was incurred in changing the hardening and shipping rooms from one location to the other with the resulting necessity of building over these parts of the plant.

3. During the year 1918 the taxpayer purchased from four of its stockholders the shares of its capital stock held by those stockholders. Ninety-four shares were thus purchased, the taxpayer paying therefor, in cash and property of the corporation, the sum of $20,947.01. The shares were of the par value of $100 per share. Payment was made as follows: J. M. Berry received $6,000 for 30 shares, C. O. Barrow received $200 for 1 share, J. A. Gordon received $600 for 3 shares, E. M. Bartlett received $14,147.01 for 60 shares. Payment was made to Bartlett as follows: In October, 1918, $8,697.40 cash and $5,059.61 in property of the company. (This property consisted of the Brighton creamery, a branch of the taxpayer corporation, of the value of $3,157.01; a note due the taxpayer from Bartlett in the amount of $1,800; accrued interest on said note in the amount of $102.60.) In December, 1918, Bartlett received further payment of $390 in property connected with the Brighton creamery. The total sum of cash and property paid by the taxpayer for 94 shares of its capital stock was $20,947.01. The stock thus purchased by the tax-

payer was original issue stock at par of $100 per share, full paid and nonassessable. The total issue of outstanding stock was 323 shares.

4. On December 30, 1918, at a meeting of the stockholders of the taxpayer corporation it was voted to sell these 94 shares, purchased by the corporation as set out in paragraph 3 of these findings, to Charles A. Simmons and Jonas M. Hammond at the price of $110 per share, which was the price offered by Simmons and Hammond therefor. Accordingly the officers of the corporation were authorized to sell and deliver 47 shares (of the 94 shares purchased) to Simmons in consideration of $5,170, payable without interest in installments equal to the amount of the dividends which might thereafter be declared upon said 47 shares, until the total amount of $5,170 shall have been paid by Simmons to the corporation, said installments being payable as and when such dividends shall have been declared upon the said 47 shares; "but in case of the declaration by the corporation of a stock dividend the shares of stock declared as a dividend upon said 47 shares shall be retained by the holder of said 47 shares and none of the installments above referred to shall be due because of such stock dividend." Identical action was taken with reference to the other 47 shares (of the 94 shares purchased) which were sold to Hammond. Before the purchase by the corporation of the 94 shares, as set out in paragraph 3 above, Simmons and Hammond held 188 shares of the total outstanding issue of 323 shares; Barrows, Berry, and Bartlett held 94 shares, and 41 shares were held by other parties. At the stockholders' meeting of December 30, 1918, on the motion to sell 47 shares to Simmons, 145 shares were voted in the affirmative; none was voted in the negative. Simmons did not vote. Similarly, on the motion to sell 47 shares to Hammond, 125 shares were voted affirmatively; none in the negative. Hammond did not vote.

5. On December 30, 1918, upon the consummation of the transactions set out in paragraph 4 above, the profit-and-loss account of the taxpayer corporation was charged with $10,607.01, that figure representing the difference between the price paid by the corporation for the 94 shares ($20,947.01) and the price at which the same shares were resold by the corporation to Simmons and Hammond ($10,340). No dividends were declared or paid by the taxpayer corporation between November, 1918, and August, 1920. In June, 1920, Simmons and Hammond each paid to the corporation $5,170 (a total of $10,340) as full payment for the 94 shares purchased by them on December 30, 1918.

6. In the year 1919 the taxpayer made alterations, improvements, and betterments to its plant similar in character to those referred to in paragraph 2 of these findings. These expenditures aggregated $2,941.67. The Commissioner allowed the taxpayer $2,313.89 of these expenditures as deductible expenses in the year 1919, but disallowed, on the ground that they constitute capital expenditures, the following: Piping on leased property, $95; cork insulation work, $96.15; alterations and piping in ice cream department, $436.63; total, $627.78.

7. In his answer to the petition the Commissioner admits that error was made in the additional tax proposed in his deficiency letter in so far as it is based upon the disallowance of $1,268.20 (referred

to in paragraph 2 above), which is the cost of the improvements placed on property occupied by the taxpayer as a tenant at will.

8. On August 19, 1924, the Commissioner mailed to the taxpayer a statutory deficiency letter showing proposed additional taxes for the year 1918 of $18,702.23, for the year 1919 of $1,107.94. For the year 1920 an overassessment of $544.05 was shown. The taxpayer appealed therefrom and filed its petition with this Board on October 18, 1924.

## DECISION.

The deficiency should be computed in accordance with the following opinion. Determination will be settled on consent or on 15 days' notice in accordance with Rule 50.

## OPINION.

KORNER: The record in this appeal clearly warrants the conclusion that the items $3,804.63 and $627.78, expended in 1918 and 1919, respectively, were for improvements and betterments to leased properties and as such constitute capital expenditures which should be charged off ratably over the life of the lease. *Appeal of National City Bank of Seattle*, 1 B. T. A. 139.

The Supreme Court of the United States has made it clear that expenditures for additions and betterments are properly chargeable to capital account. In *Illinois Central R. R. Co.* v. *Interstate Commerce Commission*, 206 U. S. 441, at page 462, the court, in distinguishing between "capital expenditures" and "ordinary and necessary expenses," said:

The findings show that the old rates were profitable and that dividends were declared even when permanent improvements and equipment were charged to operating expenses. *But may they be so charged?* Appellants contend that the answer should be so obviously in the affirmative that it should be made an axiom in transportation. On principle it would seem as if the answer should be otherwise. It would seem as if *expenditures for additions to construction and equipment, as expenditures for original construction and equipment, should be reimbursed by all of the traffic they accommodate during the period of their duration, and that improvements that will last many years should not be charged wholly against the revenue of a single year.*

Again at page 463 it is said:

We think it is clear that instrumentalities which are to be used for years should *not be paid for by the revenues of a day* or year; and this is the principle of returns upon capital which exists in durable shape. (Italics ours.)

The same court, in *Union Pacific R. R. Co.* v. *United States*, 99 U. S. 402, page 420, said:

Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; while *expenses chargeable to capital include those which are incurred in* the original construction of the works, and *in the subsequent enlargement and improvement thereof.* (Italics ours.)

The case of *Central Railroad Company of New Jersey* v. *Duffy*, 289 Fed. 354, was called to our attention by the taxpayer. That case is now before the Supreme Court of the United States for review upon writ of certiorari. But in any event the decision of the Circuit

Court of Appeals therein is not authority for taxpayer's position in this appeal. In that case the leases stipulated for certain performances by the lessee as a condition to the tenancy of the lessee. The expenditures made by the lessee in so performing were construed by the Circuit Court of Appeals to be ordinary and necessary expenses paid as a condition to the continued use and possession of the properties, under the Revenue Act of 1916. There is no hint in the record here that the lease of the taxpayer contained any such provision. The taxpayer made these enlargements, additions, and alterations on its own initiative and not in performance of a condition necessary to hold its lease. The case just referred to is clearly distinguishable.

The item $1,268.20, representing the cost of improvements made to property occupied by taxpayer as a tenant at will, is conceded by the Commissioner in his answer to the petition to be a proper deduction.

In our opinion the purchase and resale of 94 shares of its outstanding capital stock by the taxpayer constituted a capital transaction. To the extent of the par value of the 94 shares ($9,400), the capital account of the taxpayer was reduced. To the extent the price paid for these 94 shares exceeded par, there was a reduction in the surplus account of the taxpayer, and a distribution of surplus to the seller of the stock resulted. While it may be true that the purchase of this stock by the corporation did not in fact constitute a retirement of the stock, yet, in so far as such treasury stock was treated by the corporation as an asset, it could have an asset value per share equal only to the remaining assets of the corporation divided by the shares of stock outstanding. Since there had been a diminution of surplus in acquiring this stock, the stock had a relatively less value in the hands of the corporation.

The record discloses that the average price per share paid by the corporation for the 94 shares was $222.84 per share. There is no evidence but that the stock so acquired had that value at the time of its purchase. At this value per share, the total outstanding 323 shares had a value of $71,977.32. When $20,947.01 had been paid for these shares, the value of the whole issue was reduced by that amount and the total value of the issued and outstanding stock (323 shares) was reduced to $51,030.31, or $158 per share. It follows, therefore, that as to the difference between $222.84 per share and $158 per share, this treasury stock did not have an asset value— unless speculative. It is well settled that this transaction of purchase of its own stock did not result in a loss to the corporation.

But the taxpayer contends that the resale of this treasury stock was a separate transaction and resulted in a realization of loss in the amount of difference between $222.84 per share, at which purchased, and $110 per share, at which sold. We have shown above that there was not a realization of loss to the extent of the difference between $222.84 and $158 per share. The query remains: Was there a realized loss of the difference between a value of $158 per share and the price at which the stock was sold, viz, $110 per share? That is, was there a realized loss of $48 per share on 94 shares?

In our opinion, there was not. The corporation held shares of its own capital stock having an asset value of $158 per share. To

the extent of their par value the capital liability of the corporation was reduced and the assets of the corporation gave a correspondingly greater value to the remaining shares outstanding. This is true although it be conceded that there remained a liability on the corporation for these shares of treasury stock, because such liability was to the corporation itself and upon liquidation inured to the benefit of the shareholders holding the remaining shares. When these shares were resold the capital liability of the corporation was restored to its original liability on 323 shares at par. If, then, the corporation had received $158 per share from the purchasers of these 94 shares, there would have been no disturbance of the balance—both assets and liabilities would have been increased in an equal amount.

But the sale was made for $110 per share instead of $158 and, although the capital liability of the corporation was thereby increased $9,400, its surplus account was not increased proportionately, the difference being $48 per share. What was the practical effect of this transaction under these circumstances? As we view it, it constituted merely a further distribution of surplus to the extent of $48 per share to the purchasers of this stock. By acquiring these additional 94 shares of stock, Simmons and Hammond increased their proportionate share in a distribution of the corporate assets without contributing proportionately to the asset account in their purchase of the shares. The loss, if any, under these circumstances, resulted to the remaining stockholders who held 41 shares out of a total of 323. A corporation can not be said to be the loser when it distributes its surplus by agreement of the stockholders. It may be that by such a distribution certain of the stockholders suffer diminution in the value of their holdings, but this is not a loss to the corporation.

It was urged upon us that shares of its issued and outstanding stock repurchased by a corporation, representing treasury stock, are in as full a sense an asset as would be Liberty Bonds or commercial securities. An analysis of this position discloses its fallacy. Such bonds and securities have an asset value totally divorced from any liability thereon of the corporation holding them. The capital liability of such a corporation remains undisturbed by the purchase of such securities. It is readily apparent that such is not the case where a corporation purchases shares of its own stock. Irrespective of how the corporation may choose to treat such stock, there is nevertheless a very real shifting and adjustment of assets and liabilities which takes place perforce. There may be such a treatment of the transaction by the corporation as to show a bookkeeping loss or gain (as was the case here), but it is not actual and real. For that reason we hold that there was in the instant appeal no actual or realized loss. We are of opinion that the method used in this transaction by the corporation was in truth and fact a distribution of surplus to Simmons and Hammond. Much could be said in support of this view upon an analysis of the manner in which the sale was made to Simmons and Hammond, but we are satisfied that our conclusion is correct on principle and does not require the support of such analysis. The determination of the Commissioner in this respect is approved.