HOUSTON BROTHERS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33597. Promulgated December 19, 1930.

*George M. Morris, Esq.*, for the petitioner.
*C. A. Ray, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The respondent determined a deficiency in income tax of $3,585.17 for 1924, resulting in part from the inclusion in income of a profit of $27,000 held to have been derived by petitioner when it acquired shares of its own stock in exchange for shares of another corporation. The proceeding was submitted upon the following stipulation of facts, with a brief for the petitioner only.

1. Petitioner, a New Jersey corporation with its principal office at Pittsburgh, Pennsylvania, was organized on May 6, 1901, and is engaged in the wholesale and retail business of dealing in builders' supplies.

2. Houston Land Company, a Pennsylvania corporation with its principal office also at Pittsburgh, Pennsylvania, was organized on May 1, 1903, for the purpose of holding title to and dealing in real property. Since the date of organization, all of its capital stock has been owned by petitioner, and it has acted as a title holding company for realty required in the business of petitioner. During the year 1905, Houston Land Company acquired by purchase, at a sheriff's sale, a brick manufacturing plant at Trafford, Pennsylvania.

3. Immediately after Houston Land Company acquired the brick manufacturing plant at Trafford, Pennsylvania, a partnership, known as Wynn and Starr, was formed, the interests therein being held as follows:

A. Q. Starr _____ 5%
A. Q. Starr, as nominee of petitioner _____ 45%
H. T. Wynn _____ 50%

A. Q. Starr was an officer and employee of petitioner.

4. Following its formation, the partnership of Wynn and Starr secured a lease from the Houston Land Company to operate the aforesaid brick manufacturing plant and began the manufacture and sale of bricks.

5. On June 19, 1912, a corporation by the name of Wynn and Starr Company was organized to engage in the manufacture and sale of bricks under the laws of the State of Pennsylvania with a capital stock of 400 shares of a par value of $100.00 each; and the partnership of Wynn and Starr thereupon transferred its assets to the corporation of Wynn and Starr Company in exchange for its entire capital stock. In the year 1914 the petitioner acquired ownership of

180 shares of the capital stock of the Wynn and Starr Company, and thereupon the shares of said Wynn and Starr Company were owned as follows:

A. Q. Starr_____ 20 shares.
Petitioner_____ 180 shares.
H. T. Wynn_____ 200 shares.

6. On or about January 3, 1924, Houston Land Company acquired from H. T. Wynn his 200 shares of Wynn and Starr Company stock in exchange for its brick manufacturing plant at Trafford, Pennsylvania, the transfer of the plant being made to one John G. Crawford; and after said exchange, the stock of Wynn and Starr Company was owned as follows:

A. Q. Starr_____ 20 shares.
Petitioner_____ 180 shares.
Houston Land Company_____ 200 shares.

and Wynn and Starr Company continued its business.

7. On May 10, 1924, the board of directors of Houston Land Company held a meeting, the minutes thereof reading:

" Present: S. M. Houston, A. Q. Starr and T. T. Newhams.

" A. Q. Starr presented his resignation as Vice President and as a director of the Company to become effective July 1st, 1924. On motion duly made and seconded, the resignation was accepted.

" On motion duly made and seconded the proposal of A. Q. Starr to transfer to the Company 383 shares of the capital stock of the Houston Brothers Company, in exchange for the 200 shares of the capital stock of the Wynn & Starr Company owned by the Houston Land Company, was accepted and the secretary of the Company was instructed to properly endorse the relative stock certificates of the Wynn & Starr Company to A. Q. Starr, upon surrender by him of the relative stock certificates of the Houston Brothers Company, properly endorsed to this Company.

" There being no further business before the Board the meeting on motion duly made and seconded, adjourned."

On May 10, 1924, the board of directors of petitioner held a meeting, the minutes thereof reading:

" A special meeting of the Board of Directors of Houston Brothers Company was held at one o'clock on May 10th, 1924 in the Chamber of Commerce Building office, attended by S. M. Houston, A. Q. Starr, S. F. Donaldson, R. J. McAuley, J. F. Nulton and T. T. Newhams.

" The President, S. M. Houston, called the meeting to order and the Secretary read the minutes of the last meeting, which were approved.

" Mr. A. Q. Starr, presented his resignation as Vice President of the Company and, upon motion, it was accepted.

" Mr. Starr made a proposition at this meeting to turn over to Houston Brothers Company 345 shares of Houston Brothers Company stock that he owns in even exchange for 180 shares of Wynn & Starr Co.'s stock owned by the Houston Brothers Company.

" After a general discussion, the Directors were of the opinion that Houston Brothers Company would be better off to dispose of this stock as none of the remaining Directors were familiar with the Brick Manufacturing business and that it would be better to confine the Company's activities to jobbing and re-tailing of builders supplies. Mr. Donaldson made a motion that we accept this proposition and it was seconded by Mr. Nulton. When put to a vote the motion was carried.

" After a general discussion of business conditions, upon motion, the meeting adjourned."

8. The transactions referred to in the foregoing minutes were consummated; and A. Q. Starr became the owner of the entire capital stock of Wynn and Starr Company, and the owner of no stock of the petitioner.

9. If the transactions described herein resulted in any taxable gain to the petitioner, the value bases employed by the Commissioner would be correct and the taxable gain would be $27,000.00.

10. Upon the filing of this stipulation, the above-entitled appeal shall stand submitted, subject to the filing of briefs by the parties within sixty days thereafter.

The issue arises from the facts of paragraphs 7, 8, and 9. Petitioner, having in 1914 acquired at an unstated cost 180 shares of Wynn & Starr Co., exchanged them in 1924 for 345 shares of its own stock. It does not appear how many shares of petitioner's stock were outstanding, or the proportionate relation of the 345 shares to the whole, or any other facts to show the effect of this exchange upon the capital structure of petitioner. The value of these 345 shares does not appear and we are bound by paragraph 9 stipulating the amount of gain, if any may be recognized, to be $27,000. This probably means that the value of the 345 shares at the time of the exchange was $27,000 greater than the cost to petitioner of the 180 shares. For respondent there has been no brief or argument and no statement of the theory or authority in statute or regulations upon which his determination is based.

In the hands of petitioner, the 180 shares of Wynn and Starr stock were property, and in 1924 there was a disposition of it by petitioner. The petitioner's resolution (paragraph 7), speaks of "disposing" of the stock "in even exchange." This is literally within Revenue Act of 1924, sections 202, 203, and 204.

SEC. 202. (a) Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized.

\*     \*     \*     \*     \*     \*·     \*

(d) In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this title shall be determined under the provisions of section 203.

\*     \*     \*     \*     \*     \*     \*

SEC. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except \* \* \* [The numerous exceptions are not material.]

SEC. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except \* \* \* [The exceptions are not material.]

But, without entertaining any doubt as to whether the transaction was an exchange, it is necessary to determine whether the receipt by petitioner of its own stock may, since the stock has a peculiar character when held by the corporation itself, be regarded as the receipt of property as contemplated by the statute, and

whether in fact it brought about the realization by the petitioner of any gain. And in determining this in the present case the statute must be so construed that the same standards for its application will be used for losses as well as for gains. This symmetry is especially important because " gain or loss " is used as a single phrase in each provision of the statute, indicating an intention to provide the same rule for either. Cf. *United States* v. *Flannery*, 268 U. S. 98; *Ludington* v. *McCaughn*, 268 U. S. 106.

In the regulations of the Commissioner, the principle has been consistently announced that a corporation realizes no gain or loss from the purchase or sale of its own stock: Reg. 45, art. 542, 563; Reg. 62, art. 542, 563; Reg. 65, art. 543, 563; Reg. 69, art. 543, 563; Reg. 74, art. 66, 176, or the " distribution of its assets in kind upon dissolution," Reg. 45, art. 547; Reg. 62, art. 547; Reg. 65, art. 547; Reg. 69, art. 547; Reg. 74, art. 71.

This principle was contested under the 1918 Act in an early case before the Board, *Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803 (1925), and after extended consideration was approved. The corporation in 1918 acquired some of its own stock for cash and property, and later in the same year sold this stock for cash of a less amount than it had given for the stock. There was no thought of liquidation or of dividend. No question was raised as to the significance or effect of the first transaction by which the stock was acquired in exchange for cash and property, a similar transaction to the one now before us; but it was apparently treated without debate as involving no gain or loss. Only the subsequent disposition of the stock for less than cost was examined, and this, the Board held, involved no recognizable loss. The reason for this was that its effect was a new distribution of capital interest among stockholders the inherent nature of which, so far as the corporation was concerned, was a new contribution of capital of stockholders after a partial distribution to them of its assets.

This doctrine was applied in *Cooperative Furniture Co.*, 2 B. T. A. 165 (1925), holding that no deductible loss was sustained by the taxpayer corporation in the sale of its own stock in 1919 for less than its cost in 1915. In *Illinois Rural Credit Association*, 3 B. T. A. 1178 (1926), the Board held without much discussion that cash acquired through the forfeiture of stock subscriptions was not income. Clearly there was a gain, for the corporation received more than it gave or promised to give; but because the gain was derived from dealing in the corporation's own stock, it was called a " capital receipt as distinguished from income." It is not clearly stated whether the stock had been issued before forfeiture, but we may assume it was; in which case the forfeiture was, in effect, like a

repurchase. Essentially, therefore, it was an application of the same old doctrine that gain or loss is not found in a corporation's dealings in its own stock. While *Hutchins Lumber & Storage Co.*, 4 B. T. A. 705 (1926), did not present any question of the effect upon net income of the corporation's dealings in its own stock, the nature of such a purchase was considered in its effect upon statutory invested capital under the 1918 Act, and the Board said:

The important facts upon which we must adjudge the character of this transaction are—that the Booth-Kelley Lumber Co. had acquired this stock from the petitioner for the sum of $30,000, which became a part of the petitioner's paid-in capital; that upon the repurchase of this stock the petitioner returned to the Booth-Kelley Lumber Co. the latter's contribution of $30,000 capital and its share in the petitioner's accumulated surplus. It was a capital transaction involving a return to this particular stockholder of its capital contribution plus its share in the accumulated surplus, and the paid-in capital and surplus, of which these funds were a part, were lessened by the withdrawal of the same. The purchase by a corporation of its own capital stock eliminates the stockholder without substituting another in its place, repays to the withdrawing member his share of the capital, and reduces the amount of the fund contributed to the common venture. See *Appeal of Simmons & Hammond Mfg Co.*, 1 B. T. A. 803.

*Farmers Deposit National Bank*, 5 B. T. A. 520; *Interurban Construction Co.*, 5 B. T. A. 529; and *H. S. Crocker Co.*, 5 B. T. A. 537, were a group of cases decided November 16, 1926, in all of which the sale by one of an affiliated group of corporations of shares in any one of the group was, because of the tax unity of the group, treated as a transaction by a corporation in its own stock, resulting, as in *Simmons & Hammond Co.*, *supra*, in neither gain nor loss. The postulate is stated as follows:

That a corporate taxpayer realizes no taxable gain from the sale of its own capital stock is a well established principle of the taxing statutes. It is a principle which the Commissioner has consistently adhered to in all of the regulations promulgated under the several revenue acts. In the *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803, this Board held that the sale by a corporate taxpayer of its own capital stock constituted a capital transaction and that no deductible loss resulted therefrom. It follows, *per contra*, that a corporate taxpayer realizes no taxable gain from the sale of its own capital stock.

and is thus applied:

Applying these principles to the facts in this case, what is the situation? The Farmers Deposit Trust Co. and the Farmers Deposit National Bank were, during the taxable year 1919, affiliated within the meaning of section 240 (b) of the Revenue Act of 1918. They were, for the purposes of the income and profits taxes, one and the same taxpayer. The sale by the Trust Company of its capital stock holdings in the National Bank must be treated, for the purpose of the tax, as nothing more than a sale by the affiliated group of its own capital stock. The entire proceeds from the sale of this stock represented additional capital to the affiliated group—the investment of the new stock-

holders who purchased the stock. The sale was a capital transaction which could not give rise to a taxable gain or a deductible loss. The Commissioner erred in treating the excess of the selling price over the cost of the stock as taxable income to the Trust Company and the affiliated group. [*Farmers Deposit National Bank*, 5 B. T. A. 520.]

There is the further consideration that, under the affiliation provisions of the statute, the acquisition by one company of the stock of another, thereby creating affiliation, creates no additional investment in the affiliated group. By the act which created the affiliation the group acquires a part of its own capital stock. The affiliation continues in existence until the stock of the subsidiary is disposed of by the parent corporation. Considering the affiliated group as an entity, the sale is a disposition by it of a portion of its capital stock. We have heretofore held that dealings by a corporation in its own capital stock give rise to no profit or loss. *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803. [*H. S. Crocker Co.*, 5 B. T. A. 537, 541.]

The *Appeal of Liberty Agency Co.*, 5 B. T. A. 778 (1926), presented several issues under the Revenue Act of 1918, one of which is directly in point. The corporation taxpayer had issued preferred shares for which it had received from its stockholders par of $100 per share. In 1919, 201 of these preferred shares were outstanding. The corporation resolved to retire these shares. It had on hand more than 402 shares of stock in another corporation which had cost it $37.50 a share. The market price thereof had risen to $50 a share. To its preferred shareholders it gave two shares of the other stock in exchange for one of its own preferred,' and on its accounts it showed a profit of $12.50 on each of the 402 shares of the other stock, the excess of the $50 market value over the $37.50 cost. This transaction was substantially like that now before us, and the Board, following the doctrine of *Simmons & Hammond Mfg. Co.*, *supra*, held simply that the petitioner realized no taxable gain.

On July 3, 1928, the Board decided *Callanan Road Improvement Co.*, 12 B. T. A. 1109, which has not, and apparently was not thought to have, any logical relation to the line of cases theretofore decided regarding a corporation's transactions in its own stock. We consider it here, however, because it has been cited in later decisions as the forerunner of a variation in the general principle. The Callanan Co. had declared an ordinary cash dividend of $12,000 thus creating a debt to its stockholders. Having on hand property, consisting of Liberty bonds, for which it had paid $12,000, it desired to use these in discharge of the dividend debt. But the bonds had dropped in value to $10,636.80 and the corporation was therefore required to add the difference in cash. The Board held that the drop in value became a sustained loss when the bonds were disposed of. They served to discharge the debt only up to $10,636.80—that is, the corporation received a credit of only this amount for property which had cost it

$12,000. There was no transaction in the corporation's shares, and no reference was made to the principles or effect of such transactions or to the preceding decisions in which they were considered.

On July 16, 1928, a division decision not reviewed by the Board, was promulgated in *Behlow Estate Co.*, 12 B. T. A. 1365. The corporation owned stocks and bonds which had cost $42,100.50. One shareholder, who owned 1,015.7 shares, was indebted to the corporation in an unstated amount. He "offered to sell" his shares to the corporation for, and the corporation agreed to give him, $10,000 in cash, the stocks and bonds at an agreed value of $32,211, the cancellation of his debt to the corporation, and the corporation's note for an unstated amount. The aggregate to be given by the corporation is only stated as $63,500 plus the discharge of the shareholder's debt. This transaction was apparently carried through in 1921. The transaction is described by the corporation in its resolution as the purchase of its own shares, the price of which included the property. The opinion, however, regards the transaction entirely as a sale by the corporation of the stocks and bonds for $32,211 cash, which was $9,889.50 less than cost, and hence a plain loss by sale. The principle of the *Simmons & Hammond Co.* case and its following cases was regarded as irrelevant. The grounds of distinction and decision are stated in a paragraph as follows:

The cases relied upon [by respondent] are not authority for the position taken. This is not a case of a gain or loss realized or sustained by a corporation in the purchase of its own capital stock or gain or loss resulting from the purchase by or within an affiliated group of corporations. Petitioner seeks to take a loss represented by the difference between the cost of the stocks and bonds in question and the sale price thereof. The stock of petitioner is not in question nor a gain or loss resulting from the purchase thereof. In the *Appeal of Simmons & Hammond Mfg. Co.*, *supra*, the petitioner had purchased its own capital stock and endeavored to take a loss on the subsequent sale of the same. We held that to be a capital transaction that did not result in a realized loss. Here the petitioner is not seeking such a loss but rather one that resulted from the sale to Behlow of stocks and bonds of other corporations for less than cost. The fact that the stocks and bonds were to be applied to the extent of their then value in payment of the purchase price of its own stock does not make the same a capital transaction from which neither gain nor loss may result. Cf. *Callanan Road Improvement Co.*, 12 B. T. A. 1109.

On March 25, 1929, a division decision not reviewed by the Board was promulgated in *New Jersey Porcelain Co.*, 15 B. T. A. 1059. The corporation in 1923 rid itself of an unnecessary old plant, of which the depreciated cost was found to be $47,088.35, by "selling" it to four of its shareholders for a "purchase price" of $25,000 made up of cash $1,340, first mortgage $10,000, and its own common and preferred shares at par of $13,660, which was found to be its market value. The decision held that a deductible loss had been

sustained of the difference between the $47,088.35 cost and the $25,000 fixed as the value received. It followed *Behlow Estate Co.*, *supra*, in distinguishing the principle of *Simmons & Hammond* and later cases, *supra*, and also cited *United States* v. *Cedarburg Milk Co.*, 288 Fed. 996, saying:

> In conformity with our own decision in the *Behlow* proceeding, *supra*, and with the opinion of the court in *United States* v. *Cedarburg Milk Co.*, *supra*, we conclude that the transaction here involved is not to be regarded as the purchase by the petitioner of its own stock or the liquidation of such stock, but as a sale of capital assets. This being true, the purchase price must be ascertained by including therein the fair market value of the property other than cash and mortgages which was received.

The opinion of the District Court in *United States* v. *Cedarburg Milk Co.*, 288 Fed. 996, cited in support of the *Porcelain* decision, was a short memorandum from which the facts do not appear; but it seems that the taxpayer transferred its assets to another corporation in exchange for not its own shares, but those of the vendee, the assets of the two being thus merged. The District Court held that the gain was taxable. The Board's opinion in the *Porcelain* case treats the facts in the *Cedarburg* case as " almost identical to those herein, with the position of the parties reversed," and mistakenly assumes that the " consideration was shares of its own capital stock," when in truth the consideration was shares of the vendee. When this error of fact is corrected, the *Cedarburg* case lends no support to the opinion and may be dismissed from further consideration of the present question.

The principle of the *Simmons & Hammond* case has never been contested in the courts. In *Remington Rand, Inc.,* v. *Commissioner*, 33 Fed. (2d) 77, which went off on another point, the Circuit Court of Appeals, Second Circuit, June 3, 1929, intimated a possible doubt by saying—

> * * * even if it be conceded that dealings by a corporation in its own shares give rise to neither taxable profit nor deductible loss, as was held in *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803.

The Commissioner acquiesced in the *Liberty Agency* case, C. B. VI-2, p. 4, and has refused acquiescence in the *Behlow* and *New Jersey Porcelain* cases, C. B. VIII-1, p. 51, and C. B. VIII-2, p. 68.

From this examination of the law thus far announced, two doctrines appear: (1) That a corporation which avowedly buys, sells or redeems its own shares—" deals in its own capital stock "—realizes neither gain nor loss; and (2) that a corporation realizes loss if it " sells " property for its own shares taken at a value less than the cost of the property. This is a clear conflict, unless legal force is to be given to whether the transaction is called a sale of property or a purchase of its own stock and the emphasis placed upon the one side

or the other of the exchange. This would make the law a mere logomachy. In the present case, the corporation has dealt in its own shares by exchanging for them some of its property—a single transaction, as much an acquisition of its shares by purchase as it was a disposition of its property by sale. Whether the advantage was with the corporation—that is, a gain as conditionally stated in the stipulation, or against it—that is, a loss as found in the *Behlow* and *Porcelain* cases, is purely adventitious. The corporation presumably desired with equal fervor both to dispose of its property for the consideration fixed and to acquire its shares for the property. It would be specious to recognize a gain merely because the exchange were denominated a sale or disposition of property, if by calling it a purchase of shares no gain could be recognized. The essential nature and effect of the transaction because of the presence and nature of the corporation's shares must be given controlling importance; and if there is income or loss in such a transaction, it should be recognized to determine tax irrespective of the nomenclature employed.

This was a single transaction, deliberately so formulated and actually so carried out. There was no sale of assets for a price and subsequent adjustment of the price by the receipt of shares, nor a purchase or redemption of shares for cash with a subsequent adjustment by delivering the assets. There was nothing previously owing by the shareholder or the corporation. The transaction was one distinct unified exchange. As it has become established legal doctrine that, in the computation of income and levying of the tax, recognition is given to what was done even although the result and effect may have been the same as if another method with a different tax result had been used, *United States* v. *Isham*, 17 Wall. 496; *Eisner* v. *Macomber*, 252 U. S. 189; *United States* v. *Phellis*, 257 U. S. 156; *Remington Rand, Inc.*, v. *Commissioner*, 33 Fed. (2d) 77, certiorari denied, 280 U. S. 591; *Anna M. Harkness*, 1 B. T. A. 127; *Charles Rubens & Co.*, 6 B. T. A. 626; *Minnie C. Brackett*, 19 B. T. A. 1154, the decision must be predicated upon the facts of this single transaction. And we need not decide how far a different procedure accomplishing the same end might result in taxable gain or loss.

There can be no serious doubt that if a corporation acquires all its stock for its assets, thus expressly or in effect liquidating and distributing its assets to its stockholders, no gain or loss would be recognized; notwithstanding and wholly irrespective of whether the assets rose in value, so as to represent an untaxed increment, or diminished below cost. Nor is it legally disputable that by disposing of its stock by original issue for cash or property it has neither gain nor loss, regardless of values. Although these situations may properly be called "dispositions" by the corporation of its property, and thus literally within the statute, they are not within its intendment. Whether this

is because the word "disposition" is construed to exclude them or the word "property" is construed to exclude the corporation's own stock is academic. The only problem seems to be found when the transaction takes place by a going corporation and involves less than all its outstanding stock. This problem results, apparently, from the readily marketable character of stock as property and the facility with which many corporations can in the open market buy or sell their own shares and account for them as if they were assets. But the form of the transaction and its denomination as a purchase are not important. The effect is the same as a redemption or retirement of the stock, that is, to remove assets from the corporation's capital and surplus and proportionately to reduce its outstanding evidences of stockholder interest. It matters not for our purpose whether the shares acquired be finally canceled or merely held and called treasury stock, for the corporation's financial situation is the same in either case. The accounting custom of showing capital stock and surplus as liabilities on the ledger and balance sheet is a mere exigency of preserving the accounting balance. In law and in fact the stock and surplus are not liabilities, and the stockholders, whose interest they reflect, are not creditors, until after dividend; and when dividend is declared, the accounting shifts. *Eisner* v. *Macomber*, 252 U. S. 189. (It is this change, effected by a declared dividend, in the nature of the stockholder's right from a proprietary interest in a potential distribution to a creditor's direct chose, which lies at the root of the *Callanan Road* decision, *supra*.) Morawetz on Private Corporations, Second Edition, vol. 1, sec. 112, p. 109, "Purchase by Corporaton of Shares in Itself," says:

A purchase by a corporation of shares of its own stock, in effect, amounts to a withdrawal of the shareholder whose shares are purchased from membership in the company, and a repayment of his proportionate share of the company's assets. There is no substitution of membership under these circumstances, as in case of a purchase and transfer of shares to a third person, but the members of the company and the amount of its capital are actually diminished. Whatever a transaction of this character may be called in legal phraseology, it is clear that it really involves an alteration of the company's constitution, just as a withdrawal of a member of a copartnership, with his proportionate share of the joint funds, involves an alteration of the constitution of a copartnership. The amount of the company's assets and the number of its shareholders are diminished. Every continuing shareholder is injured by the reduction of the fund contributed for the common venture; and the creditors who have trusted the company upon the security of the capital originally subscribed, or who are entitled to expect that amount of security, are entitled to complain.

It is no answer to say that shares having a market value must be regarded like any other personal property, and that no person is injured if a solvent corporation in good faith purchases shares in itself at their market value, inasmuch as the shares so purchased are property in the hands of the company, and may at any time be reissued or sold. No verbiage can disguise the fact, that a

purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the reissue has taken place. The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement, and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds.

It is quite possible that, by disposing of some of its assets in exchange for or retirement of some of its outstanding shares, a corporation may be in a stronger financial position than before. But this means only that the distributive interests of its shareholders have been potentially improved. The assets of the corporation itself are not more or of greater value. They are actually less, and only the proportionate value of the shares still in the hands of shareholders has been increased. Before it can be said that the corporation has profit, it must be found not only that it has disposed of its property, but that it has received assets of greater value than the cost of those disposed of. But since a corporation's own shares are not assets, but only the convenient machinery for evidencing shareholder interests, it is a fallacy to say it has received anything and *a fortiori* that it has received a gain. Cf. *105 West 55th St., Inc.* v. *Commissioner*, 42 Fed. (2d) 849; affirming 15 B. T. A. 210.

Since, then, a corporation realizes neither gain nor loss by a complete disposition of its assets to its stockholders and receipt of their stock, regardless of whether such transaction is called liquidation, retirement, purchase or exchange of stock, logically a similar transaction in part of the stock has *pro tanto* a similar result. There may be a possible view, which we need not now affirm or deny, that in a casual purchase and sale in the open market by a corporation of some of its own shares under established proof that nothing more was intended or accomplished than a temporary holding of the shares in its treasury, the analytical effect on the corporation's capital structure could be overlooked and a gain or loss recognized as in other sales. The difficulty with such a rule, however, would lie in finding the point, whether in numbers or otherwise, at which it is to be distinguished from the wider rule. The Supreme Court in *Eisner* v. *Macomber*, *supra*, established that the analytical view of capital stock was controlling, holding that whether the receipt of stock as a dividend constitutes income is controlled by the effect of its issuance upon the corporation and the stockholders. In *Miles* v. *Safe Deposit & Trust Co.*, 259 U. S. 247, the analytical view was held applicable to stock rights. And in *Edith Scoville*, 18 B. T. A. 261, the Board

held that in the converse of a stock dividend, where stockholders relinquish stock proportionately, they have no loss. Logically the corporation is correlatively without gain.

There is also the difficulty of making a distinction between a purchase or sale of such shares and an exchange for other property. Ordinarily it is said that a purchase alone involves neither gain nor loss, a subsequent sale or disposition being necessary to bring it about. Thus there would be two reasons why the corporation's acquisition of its own shares by exchange results in no gain or loss to it, and both of these would be set at naught by looking alone at the fact that corporate assets are disposed of in the exchange.

Added to these difficulties, is that of determining the value of the shares received to measure the gain or loss. Clearly there is to some extent, and perhaps proportionately with the value of the assets disposed of, a reduction in the value of all the shares; but as to all the remaining shares, this is completely offset by the reduction in the number of outstanding shares, and on the accounts the liability side should be reduced coordinately with the asset side. What then is the measure of value of the particular shares received by the corporation in the exchange? In this proceeding, such question has been removed by the stipulation of the figure to be used if gain is to be recognized. But the problem is not solved in general because the parties have agreed in this case to step around it.

The foregoing considerations, in our opinion, demonstrate the soundness and wisdom of the rule of the regulations and of the *Simmons & Hammond* case. When a corporation engages in a transaction which involves the receipt or disposition of its own shares, no gain or loss is recognizable in determining its taxable net income. Under this rule a corporation which disposes of its assets and has no intention of liquidating any of its shares can generally avoid a direct exchange with its innocuous tax result; but whether it can or not, if it chooses an exchange involving its own shares, its tax must remain unaffected. The *Behlow Estate Co.*, 12 B. T. A. 1365, and *New Jersey Porcelain Co.*, 15 B. T. A. 1059, were wrong. The petitioner before us realized no gain when it exchanged some of its assets for some of its shares.

Reviewed by the Board.

*Judgment will be entered for the petitioner.*

---

ARUNDELL, dissenting: I respectfully dissent from the conclusion reached in the majority opinion.. I have pointed out in my dissenting opinion in the case of *Woods* v. *Commissioner*, this day decided, some of the reasons for my view. The error of the majority opinion

lies in its approach. It treats the transaction as essentially one by petitioner in its own stock rather than the sale by it of property at a price in excess of cost. Certainly, if petitioner had received in payment for the 180 shares of Wynn & Starr Co. stock, cash or property, other than stock of its own company, there would have been, on the stipulated facts, a profit of $27,000, all subject to tax. That the medium of payment happens to be its own stock makes the profit none the less and as it falls within the definition of income so often announced, I see no escape from the conclusion that it is subject to tax.

Where a corporation sells its stock of a par value of $100 for $110 there is no difficulty in reaching the conclusion that it has not made a profit of $10, for the amount paid in above par is but a paid-in surplus. Or should it sell its stock for $90, there is no loss, for again there has been but $90 invested in the business. The question becomes more difficult where a corporation buys its own stock on the market at one price and later sells it for a less or greater price. Such transactions were recognized in *Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803, as not giving rise to a taxable gain or loss. These cases are on the border line. But the present case would carry *Simmons & Hammond* to the extreme of saying that where a taxpayer sold property (not its own stock) at a profit, such profit may not be taxed if the medium of payment happens to be the seller's own stock. This carries the reasoning in *Simmons & Hammond* beyond its natural purpose. *Behlow Estate Co.*, 12 B. T. A. 1365, and *New Jersey Porcelain Co.*, 15 B. T. A. 1059, it seems to me state the correct rule and they should not be overruled.

It should be recognized that in those cases where a corporation acquires its own capital stock in exchange for property disposed of by it there are two transactions which must be considered—the acquisition of the stock, and the payment for the property. Under the decisions cited the first does not result in gain or loss; the second may. There is a gain or loss on the disposition of the property measured by the difference between the cost and selling price of such property, but no taxable gain or deductible loss between the issue price and cost of its own stock. The questions involved are entirely different, as is also the measure of the gain or loss.

The principle involved is no different than when stock is issued by a corporation for property. In such cases we have repeatedly held that for the purpose of computing gain or loss on the subsequent sale of the property, or for purposes of depreciation or depletion, the cost of the property was the fair market value of the shares issued. Does it not follow that if shares are received for property, the selling price of the property is the fair market value

of the shares received? All that is taxed is the gain or loss on the "sale or other disposition" of the property; any apparent gain or loss on the shares does not enter the computation and, in fact, depends upon a factor not involved in the computation of gain or loss on the sale of the property, viz., the selling price of the stock.

MORRIS, LANSDON, MARQUETTE, SMITH, PHILLIPS, and MATTHEWS agree with this dissent.