Delaware Steeplechase and Race Association v. Commissioner.
Delaware Steeplechase & Race Ass'n v. Commissioner
Docket No. 10886.
United States Tax Court
1950 Tax Ct. Memo LEXIS 75; 9 T.C.M. (CCH) 893; T.C.M. (RIA) 50245; October 17, 1950
*75 Laurence Graves, Esq., 20 Exchange Place, New York 5, N. Y., and William J. Harris, Esq., for the petitioner. George J. LeBlanc, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding was brought for a redetermination of the following income and excess profits tax deficiencies: Income
Excess Profits
Year
Tax Def.
Tax Def.
1941
$3,632.78
1942
781.87
$40,546.88
Some of the issues have been disposed of by the parties and the only litigated issues relate to the deduction or capitalization of monies spent in connection with petitioner's buildings and race track surface; and the deduction of a fee paid to lawyers appearing before a Congressional Committee in opposition to legislation proposing to tax pari-mutuel horse-race betting. Petitioner, a Delaware corporation, organized in 1935, filed its Federal income and excess profits tax returns for 1941 and 1942 with the collector of internal revenue for the district of Delaware. In 1936 petitioner started construction of a flat and steeplechase racing plant on a site about eight miles soughwest of Wilmington, Delaware. It was completed in 1937 when a 24-day *76 race meeting was held. Race meetings were held for 28 days in 1938 and for 30 days in each of the years 1939 to 1942. The maximum number of racing days permitted by State Statute is 30 days. A major source of petitioner's income is from its commissions on pari-mutuel betting pools. This was controlled by Delaware statute which also made requirements as to the application of a portion of this income to the retirement of petitioner's funded debt or preferred stock. After payment of its Federal taxes, petitioner found that its income was not adequate to meet the requirements of the statute and properly maintain its racing plant during 1937 to 1940. This situation was presented to the 1941 session of the Delaware legislature, which meets biennially. The legislature granted petitioner a substantial increase in the amount of its commissions on pari-mutuel betting. Its income from this source, as shown on its return, averaged $49,402.19 per year for the period 1937 to 1940, and for 1941 and 1942 amounted to $286,630.48 and $260,839.43, respectively. As constructed in 1936 and 1937, petitioner's track for flat racing was a one mile oval. It was constructed on a base somewhat like that *77 of a regular road-bed and it sloped from the outside to the inside. This base was not sealed in any manner. It was covered with a four-inch cushion of loose soils. The track was used for races and the training of horses before and after the race meetings for a total period of approximately nine months of the year. During these nine months the cushion was broken and powdered by harrowing and dragging. By force of the elements a racetrack used as was petitioner's will lose approximately one-fourth of one inch of its racing cushion each year. By reason of petitioner's lack of funds in the years 1937 through 1940, it was not able properly to maintain its racing track. In addition to the erosion, the use of the track caused additional loss of the cushion soils. Spots developed by reason of an undesirable clay working up through the cushion from the base of the track. The cushion lost some of its "life" and tended to pack and become hard in dry weather and become sticky and gummy in wet weather. It did not dry out in a satisfactory manner. This condition caused a slow track which was not liked by horsemen and the betting public. Owners and trainers are wary of a track which is not in good *78 condition for fear of injury to their horses. After 1940 it would have been extremely difficult to restore this track in any one year simply by an admixture of new soils. After the 1941 race meeting it was decided that the old surface of the track should be removed and new one installed. The new 1941 cushion was substantially the same composition as that put on the track in 1937. The new blended soil was spread over the track in a four-inch cushion at a total cost of $34,999.88, consisting of the following estimated items: Soil
$ 6,669.75
Peat Moss
2,382.82
Pipe, posts, etc.
266.87
Excavating-removing original surface
5,872.42
Labor
19,808.02
Total
$34,999.88 Respondent has allowed a deduction of $3,271.04 as a deduction for the cost of removing the old soil. The difference of $31,728.84 was disallowed by respondent as a deduction because of his position that it represented a capital expenditure. In 1942 an unusual number of soft spots developed in the track, particularly on the inside of the track where most of the racing is done. Such a condition constitutes a danger to horses and jockeys. It was thought that the new surfacing had adversely affected *79 the track drainage and the trouble was also attributed to spots of the undesirable clay which held the water and worked up through the cushion of the track. These spots can be eliminated by digging out the subbase where they appear and replacing this clay with new material. The number of soft spots were so great in 1942 that it was decided to replace a portion of the subbase rather than make spot repair jobs. To do this the cushion on the portion of the track adjacent to the inside rail was pushed back over the outside portion of the track, the subbase was excavated to a depth of 18 inches at the rail, tapering to 6 inches at the center of the track. It was then sealed with asphalt and the base reconstructed by use of new material which was free of the undesirable clay. The racing cushion was pushed back in place. The sum of $19,064.73, representing the cost of this work, was deducted by petitioner on its return for 1942. Respondent has allowed $7,989.33, being the estimated costs of removing old material, and the depreciated cost of the material removed. The remaining amount has been disallowed as a deduction on the ground that it constitutes a capital expenditure. Petitioner's *80 racetrack was no better and no more valuable after the work in 1941 relating to the racing cushion, nor after the work in 1942 relating to the subbase, than it was in 1937 when first constructed. A racetrack normally has a long life and such work as the work performed in 1941 and 1942 did not prolong its life. It constituted maintenance of the track in an efficient operating condition. Petitioner's racing plant included 73 buildings, including stall-barns, bunkhouses, dormitories, and related facilities. These were frame buildings constructed in 1936 and 1937. They were roofed with tar paper which developed cracks and caused leaks. The buildings had twisted somewhat by settling, and posts and woodwork had rotted at the base. In part, they had been set on concrete, but dirt had been thrown up and worked up around and against them, making them exposed to the dampness of the ground soil. Some posts had punched into the ground and become wet. After the close of the 1941 racing season, it was first decided to renovate and reroof approximately one-half of the buildings, but as work progressed at costs less than had been estimated it was decided to complete the entire job in 1941. The *81 total cost of the renovation and reroofing was $56,545.35, of which the reroofing accounted for $29,648.59. The remaining $26,896.76 was spent for lumber, cement, metal flashing and labor, as follows: New cement walls and footings
$ 3,730.80
Flashing eaves and gables
4,437.53
Repairs and replacements
18,728.43
Of the $56,545.35 petitioner treated $33,820, the estimate for reroofing including the flashing and gables, as a capital expenditure, and the remainder was treated by petitioner on its return as deductible expenses, and disallowed by respondent on the ground that the entire amount constituted a capital expenditure. The respondent allowed an adjustment by way of a deduction of $9,240, being the cost of the original tar paper roof, minus depreciation to 1942. The monies expended in repariring and restoring the buildings in question, exclusive of the reroofing, did not add to their value as originally constructed or prolong their normal life. During 1941 the Ways and Means Committee of the U.S. House of Representatives and Finance Committee of the United States Senate were considering the imposition of an excise tax on pari-mutuel betting. Opposition was *82 forthcoming from the states in which pari-mutuel betting was permitted and from the various jockey clubs. Petitioner had an affiliation with and raced under the rules of The Jockey Club of New York. That Club desired to voice its opposition and asked if petitioner would share the cost of legal representation for that purpose. Petitioner agreed. Representation was by members of a law firm which had been retained by The Jockey Club., Petitioner was not consulted in connection with the presentation of the arguments. Petitioner, in accordance with its agreement, paid $742.72 to this law firm in 1942 as its share of the fee for the appearance before the House Ways and Means Committee. Petitioner's deduction of this amount was disallowed by respondent on the ground that it represented an expense incurred for lobbying purposes or for influencing legislation. Opinion KERN, Judge: We are frequently required in the disposition of tax litigation to draw a line through a haze of argument where it is difficult to distinguish the grey from the white, or the grey from the black. No more difficult situation of drawing such a line exists than that in which we must determine the character of monies *83 spent with respect to properties - i.e., whether they are repairs and expense items, or replacements and capital improvements, and, therefore, capital items for tax accounting purposes. Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, acquiesced in by respondent, 2 C.B. 2, has long been regarded as a touchstone case in this phase of tax law. It states: "* * * In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable *84 to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. We have already pointed out this distinction in the Appeal of Simmons & Hammond Manufacturing Co., 1 B.T.A. 803, in which we held that expenses properly chargeable to capital account include those which are incurred in the original construction of the work and in subsequent enlargement and improvement thereof, and quoted the following from Union Pacific R.R. Co. v. United States, 99 U.S. 402, page 420: "'Theoretically, the expenses chargable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the work and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof.'" And see American Bemberg Corporation, 10 T.C. 361, affd. 177 Fed. (2d) 200; Midland Empire Packing Co., 14 T.C. 635; cf. Difco Laboratories, Inc., 10 T.C. 660. *85 Without laboring the details of the present question, all of which are set out in our findings of fact, our view of the expenses relating to the cushioning and base of the racetrack is that they are more in the nature of repair than replacement or improvement; that they added nothing material to the plant or its life; and that they therefore constitute deductible expenses. Similarly, the expenses relating to the barns and buildings, except as to the new roofs which are admittedly capital expenditures, are to be regarded as deductible expense of repairs rather than capital replacements. The expenditure with respect to these items was no more capital in nature than the expenditures made in connection with the controverted items in American Bemberg and Midland Empire, supra. Accordingly, these items are decided in favor of petitioner. With regard to the deduction of petitioner's part of the fee paid to a New York law firm for appearing in opposition to Federal legislation proposing to tax pari mutuel betting transactions, we decide in favor of respondent. Respondent's Regulation [1] deny deduction of: "* * * Sums of money expended for lobbying purposes; the promotion or *86 defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses are not deductible from gross income." The issue before us so clearly fits the provision of the Regulations that petitioner can be sustained in its deduction only if the Regulations, as here applicable, can be held invalid. We believe ourselves to be foreclosed from holding the Regulations invalid by the disposition of a closely related problem by the Supreme Court in Textile Mills Securities Corporation v. Commissioner, 314 U.S. 326. Such was our reluctant conclusion in Mary E. Bellingrath, 46 B.T.A. 89. On this authority respondent is sustained. Decision will be entered under Rule 50. Footnotes
1. Regulations 111, Section 29.23 (q)-1.↩