## ONE HUNDRED FIVE WEST FIFTY-FIFTH STREET, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 161.

Circuit Court of Appeals, Second Circuit.

June 30, 1930.

The facts were never in dispute. From the findings of the Board of Tax Appeals it appears that the "petitioner is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 22 East 49th Street, New York City.

"The corporation was organized in 1916 with an authorized capital stock of $60,000, consisting of six hundred shares of a par value of $100 each.

"All of the capital stock of the corporation was subscribed and paid for in cash by Harold C. Mathews and John J. Hearn, in equal proportions. George J. Gillespie was attorney for both parties and for the corporation. He, with his office associate, a Mr. McCarthy, held ten shares each of Hearn's stock in order to qualify them as directors of the company. Upon incorporation Hearn became president of the company and Mathews, secretary and treasurer. Immediately after incorporation the company proceeded to erect a building at 105 West 55th Street (from which it took its name) and undertook the remodeling and reconstruction of a building at 100 Central Park, South. The original paid-in capital was found insufficient to finance the projects undertaken and from time to time as additional capital was required funds were advanced by Mathews, such advances being treated as loans to the company.

"In January, 1917, the capital stock of the company was increased by an amendment to the certificate of incorporation by $60,000 or a total capitalization of $120,000. The laws of the State of New York provide that when new stock is to be issued each stockholder has the right to subscribe to an amount of new stock equal in proportion to the stock already held by him, in order to permit each stockholder's voting power to remain in relatively equal proportion. Mathews immediately subscribed to his pro rata interest in the new stock and paid for the same, thereupon becoming the holder of $60,000 par value capital stock. Hearn either refused or neglected to exercise his subscription rights to the new stock. In the meantime, the two building operations previously referred to had proceeded to completion and one of them, the 105 West 55th Street property, had been sold. The stock of the company at this time had greatly increased in value. At this point Hearn demanded that he be permitted to subscribe for his additional $30,000 worth of stock without any increase in price. Mathews took the position that he was too late; that his rights to subscribe had expired; that the company did not then need the money and that Hearn, by his refusal and neglect, had lost his right to subscribe. This claim was a source of constant friction between Hearn and Mathews.

"During the absence of Mathews in May, 1918, Hearn, president of the company, called a meeting of the Board of Directors, at which there were present Messrs. Gillespie, McCarthy and Hearn, the three directors present being a majority, elected McCarthy president pro tem, and as such he issued the remaining three hundred shares of the company's stock to Mr. Hearn. Hearn, however, instead of paying the subscription price into the company's treasury, deposited $30,000 in payment therefore into a special fund over which he had sole control.

"Upon Mathews' return and with knowledge of what had transpired in his absence, he immediately protested against the issuance of the additional shares of stock to Hearn and on July 9, 1918, after demanding its return and cancellation, commenced an action in the Supreme Court of New York to have the stock declared void. A temporary injunction against the using or voting of the stock was applied for, which injunction, after appropriate hearing, was made permanent. The order upon appeal by Hearn was duly affirmed by the Appellate Division in the fall of 1918. See 186 App. Div. 883, 172 N. Y. S. 907.

"The action came up for trial in June, 1919, before the Appellate Division. In October, 1919, judgment was entered in favor of Mathews and against Hearn, canceling as spurious the stock issued to the latter. In December, 1919, Hearn commenced a new action against Mathews and the corporation, giving his version of the facts and asking for a judgment directing that the corporation issue three hundred shares of the stock to him on payment by him to the company

of $30,000. This action was never tried and, as a result of negotiations had between the parties, Hearn's claim as set forth in his action and all other matters in dispute between him and Mathews were settled in an agreement dated December 16, 1920. Pursuant to this agreement the corporation paid to Hearn the sum of $40,480, which it deducted on its books and in the return filed for that year, as an expense.

"This settlement agreement above referred to was entered into December 16, 1920, between Mathews and Hearn. It recites the dispute between the parties regarding Hearn's right to subscribe, and that certain details of corporate management therein agreed upon were for the best interests of the corporation. By its terms the parties agreed upon the offices to be held by them and their respective salaries. A building property owned by the corporation was not to be sold prior to 1924 for less than a specified price. The corporation was to engage in no new enterprises and was to be dissolved as soon after the selling of the property as was conveniently possible. Provision was made for meeting obligations, running expenses and a reserve, the remaining surplus to be distributed as dividends. Pending litigation instituted by Hearn (as set out above) was settled and adjusted by payment of $30,000 by Mathews to Hearn or at the latter's option by the corporation transferring certain lots then under a contract of sale for $47,500 to Hearn, and to turn over the proceeds of such sale ($15,000 cash and a purchase money mortgage of $32,500). If Hearn elected to take the lots Mathews agreed to loan Hearn a specified sum of money for a time stated. Hearn was to execute a release in the litigation pending. The stock over which the dispute arose was to remain treasury stock and nothing contained in the contract was to prejudice the rights of either party in any future issue of such stock.

"By an instrument dated December 17, 1920, and attached to the contract Hearn acknowledged receipt of $40,480 from the petitioner corporation in full settlement of the disputed right to subscribe."

Douglas, Armitage & McCann, of New York City, for taxpayer.

G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch and Norman D. Keller, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and R. W. Wilson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before L. HAND, CHASE, and MACK, Circuit Judges.

CHASE, Circuit Judge (after stating the facts as above).

The petitioner claims that the $40,480 paid Hearn was either a maintenance expense or a loss deductible under the provisions of the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1077. The applicable portion of the statute follows:

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

"(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. * * * "

The claim that the payment to Hearn was a deductible loss is ill-founded. At the time of this settlement payment, the corporation had the stock and could have defeated his action by issuing it to Hearn at any time, since his suit was brought solely to establish his right to subscribe for it and have it issued to him. Moreover, it could have received from Hearn $30,000 in cash for the stock. It elected to keep it, freed from his claim, forego the $30,000, and pay him $40,480 in addition. In reality, it saw fit to make available to him $70,480 which it would and could have had in exchange for whatever right he had to subscribe for the stock at par. Possibly it was worth what it cost to get rid of his claim. If it could sell the stock for as much or more, it could replenish its treasury whenever it chose. But as to that the record is silent, and no issue turns upon the fact whatever it may be. The petitioner, in any event, did not prove a loss, for it kept the stock and there was nothing more than a distribution of assets to a minority stockholder to preserve the existing stockholding ratio of two to one between the two sole owners of the corporation. It was merely a matter affecting the capital structure of a corporation which, whenever the two stockholders who owned it could agree, was but a puppet in their hands. The rights of no one else were affected, and the corporation, although its assets were diminished, lost no more than it would have lost had the same sum been distributed to this stockholder by dividends eo nomine on the stock he already owned. His

852

ownership of that stock was the basis of his claim of right to purchase the new stock at par; that is, it lost nothing.

Nor was it an ordinary or necessary expense in carrying on its trade or business. Apart from the fact that the capital structure of this corporation was not the trade or business it carried on, the payment to Hearn was, as we have already seen, wholly gratuitous so far as it was concerned. It was quite unnecessary to pay him anything. Had he been able to have established his claim fully, the corporation need only have issued the stock to him and taken his $30,000. It had no financial interest in a transaction that had for its object and attained by its result nothing more than the settlement of a dispute between its stockholders over the right of one of them to subscribe for its stock.

We do not overlook the fact that in the settlement other matters were adjusted between Mathews and Hearn, but from the findings of fact it appears that those matters were wholly the concern of the two stockholders who together were in full and complete control of the corporation, were treated as such in the settlement agreement to which they alone were parties, and that "Hearn acknowledged receipt of $40,480 from the petitioner corporation in full settlement of the disputed right to subscribe." No more is required to make it plain that the $40,480 now sought to be deducted was paid solely to permit the stock to remain in virtual control of the majority stockholder of the corporation. The petitioner relies on Murray Hospital v. Rasmussen (C. C. A.) 20 F.(2d) 29 but the payments there alleged were made to settle controversies in which the corporation itself had a financial interest.

Judgment affirmed.