## R. J. REYNOLDS TOBACCO CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4290.

Circuit Court of Appeals, Fourth Circuit.
June 6, 1938.

J. G. Korner, Jr., of Washington, D. C. (D. H. Blair, of Washington, D. C., and M. A. Braswell, of Winston-Salem, N. C., on the brief), for petitioner.

Morton K. Rothschild, Sp. Asst. to the Atty. Gen. (James W. Morris, Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Cravath, DeGersdorff, Swaine & Wood, of New York City (Wm. D. Whitney, of New York City, Richard H. Wilmer, of Washington, D. C., and Joseph C. White, of New York City, on the brief), amici curiæ.

Before PARKER and SOPER, Circuit Judges, and WAY, District Judge.

SOPER, Circuit Judge.

The petition in this case seeks a review of a decision of the Board of Tax Appeals wherein a deficiency in income tax of R. J. Reynolds Tobacco Company in the amount of $37,865.62 for the year 1929 was determined. The determination was based upon a profit of $286,581.21 realized by the corporation during the year from sales of its own class B common stock and was in conformity with the 1934 amendment of Article 66 of Treasury Regulations 74 relating to the Revenue Act of 1928, 45 Stat. 791. The original regulation which was in force from 1918 to 1934 broadly declared [1] that a corporation realizes no gain or loss from the purchase or sale of its own stock; but the amendment of May 2, 1934 [2] stated that the real nature of the transaction determines the question whether the acquisition or disposition by a corporation of shares of its own stock gives rise to taxable gain or deductible loss; and where a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another.

The cause originated in a 60 day notice of deficiency mailed to the taxpayer on April 3, 1933, upon which the taxpayer filed a petition for review with the Board. The matter involved had no relation to the present controversy and was adjusted by agreement; but in 1936 before the agreement was formally filed with the Board, the Commissioner filed an amended answer wherein he set up his present contention as an affirmative issue. The majority of the Board was of the opinion that the broad statement in the original regulation that a corporation realizes no gain or loss from the purchase or sale of its own stock was at variance with section 22 (a) [3] of the Revenue Act of 1928, 26 U.S.C.A. § 22(a) which defines gross in-

[1] *Sale By Corporation of Its Capital Stock.*—The proceeds from the original sale by a corporation of its shares of capital stock, whether such proceeds are in excess of or less than the par value of the stock issued, constitute the capital of the company. If the stock is sold at a premium, the premium is not income. Likewise, if the stock is sold at a discount, the amount of the discount is not a loss deductible from gross income. If, for the purpose of enabling a corporation to secure working capital or for any other purpose, the shareholders donate or return to the corporation to be resold by it certain shares of stock of the company previously issued to them, or if the corporation purchases any of its stock and holds it as treasury stock, the sale of such stock will be considered a capital transaction and the proceeds of such sale will be treated as capital and will not constitute income of the corporation. A corporation realizes no gain or loss from the purchase or sale of its own stock. Treasury Regulations 74, Article 66.

[2] *Acquisition or Disposition By a Corporation of Its Own Capital Stock.*— Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

But where a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of applicable statutes. Treasury Regulations 77, Article 66 as amended by T. D. 4430.

[3] "§ 22. Gross income. (a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or per-

come to include gains, profits and income derived from sales or dealings in property, or from any source whatever; and that the amended regulation was a correct interpretation of the statute. The evidence showed that the corporation had engaged in the purchase and sale of its own stock, usually to its own profit, on numerous occasions during the period 1921 to 1929, and the Board therefore held that the gain derived from this source in 1929 was taxable.

The taxpayer in this petition for review contends (1) that the regulation in force in 1929 was in harmony with established principles of law and of accountancy and constituted a correct interpretation of section 22 (a) of the Revenue Act of 1928; and (2) that even if this interpretation was open to doubt, it was not so patently wrong as to be without a reasonable basis; and therefore it should be applied to a transaction which occurred in 1929, because it represented the administrative construction uniformly given to the Act. from 1918 to 1934, during which period the definition of income was reenacted in succeeding federal revenue acts [4] in substantially the same form as it is found in the Revenue Act of 1918, so that we should infer that the regulation correctly expressed the legislative intent.

The facts, set out in detail in the findings of the Board, 35 B.T.A. 949, may be summarized for our present purposes: The Tobacco Company has been engaged in the manufacture and sale of tobacco products in North Carolina since 1899. The capital structure has been changed from time to time by increases in the capital stock, the issuance of a class of common stock known as Class B, by stock dividends and by the reduction in par value of the common stock. The capital in 1929 was $100,000,000 consisting of $10,000,000 of $10 par common stock and $90,000,000, of $10 par Class B common stock. The latter class has no voting power and is not considered in the company's plan for profit sharing by its officers and employees.

The founder and principal stockholder at the beginning was R. J. Reynolds, whose policy was to bring as many employees as possible into the company as shareholders, entitled as such to a special annual distribution based on the profits realized. After 1912 the extension of the business was so rapid that new capital was necessary, but at the same time the management desired to protect the reputation of the company and the behavior of the stock on the market. The Class B common stock was first issued in 1918. In the same year Reynolds died and the sale of a substantial portion of his stock to several stockholders became necessary. In 1921 this stock was finally concentrated in a single corporation that was a large distributor of Reynolds products. Thereby a situation disturbing to other distributors was created, and the management determined to buy the stock and sell it to the public, thus ridding itself of a harmful influence and broadening its stockholding base at one and the same time. Accordingly, the stock was bought and as the result of this purchase and certain subsequent transactions the company came into possession of 75,000 shares of Class B common stock which it held until January 31, 1929.

During the years 1921 to 1929 the company availed itself of all opportunities of broadening its stockholding base. The result was that the number of stockholders of all kinds of stock was increased from less than 2,000 in 1922 to 9,136 holders of Class B stock alone in 1929; and this number was increased to 52,000 in 1936.

Portions of the Class B stock that were bought in 1921 were sold as follows: 21,-067 shares in 1924 and 11,000 shares in 1925, both on a rising market. In 1926, in order to protect the reputation of the stock and to prevent wide variations in prices that were feared, the taxpayer bought 21,400 shares of its stock; and later gradually fed it back into the market. In 1928 the price of cigarettes was reduced and the volume of stock offered for sale by stockholders was greatly increased. In order to protect the stock, the taxpayer bought 43,300 shares and after the market steadied, fed them back, together with 1,240 shares which had been bought in

---

sonal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." 45 Stat. 791, 797.

[4] Sec. 213 (a) of the Revenue Acts of 1918, 1921, 1924 and 1926, 40 Stat. 1057, 1065, 42 Stat. 227, 237, 43 Stat. 253, 267, 44 Stat. 9, 23. Sec. 22 (a) of the Revenue Acts of 1928, 1932 and 1934, 45 Stat. 791, 797, 26 U.S.C.A. § 22(a), 47 Stat. 169, 178, 26 U.S.C.A. § 22(a), 48 Stat. 680, 686, 26 U.S.C.A. § 22(a).

1921. During each of the years 1924 to 1928, the taxpayer reissued for cash, shares of Class B common stock theretofore acquired for cash, in the manner similar to that set forth below with respect to the year 1929, and for like reasons, and the income tax return for each year showed a substantial profit on the transactions which was carried in the return as non-taxable income.

As has been stated, the taxpayer had 75,000 shares of Class B common stock by January 31, 1929. A certificate for 15,000 shares of this stock was cancelled and new certificates were issued to various persons who paid therefor $708,690. These shares had been acquired in 1921 at a cost of $121,440.19. During 1929 the taxpayer also sold 194,000 shares which it had purchased in that year—94,500 shares at $4,506,497, which had cost $4,908,966.17, and 99,500 shares at $4,703,608, which had cost $4,601,807.43. On December 18, 1929 23% of the total outstanding shares of Class B common stock were in the hands of brokers subject to trading or speculation and were in a position to do great injury to the taxpayer and its business. At the time of the break in the market in 1929 the company had $29,000,000 in cash and government securities, and the management determined to use these funds in purchasing the taxpayer's stock offered on the market during October and November, 1929. By purchasing 90% of its stock thus offered, the taxpayer was able to hold the market price at $50. As the panic eased, the prices were scaled down to $40 and $39. During the year it purchased a total of 574,880 shares of its own stock.

At all times during 1929, the stock books and records of the taxpayer indicated that the number of Class B common stock issued and outstanding was 9,000,000 shares. When shares of this stock were purchased by the company, the certificates were regularly entered on the balance sheets of the financial statement of the taxpayer under the entry "investments in

Non Competitive Companies" at the amount of cash for which they were acquired; and they were so carried until the certificates were cancelled and new certificates were issued to purchasers in lieu thereof. The transactions of purchase and sale were not recorded so as to indicate either an increase or a reduction of the number of the outstanding shares. The cash of the taxpayer was reduced by the amounts expended in the purchases, and increased by the amounts received in the sales of the stock. At the close of the taxable year 1929, the taxpayer had on hand 431,929 shares of its Class B common stock; and these shares represented $19,270,690.98 out of a total of $19,601,594.77 appearing on the taxpayer's books as investments in non-competitive companies. The taxpayer's income tax return for the year indicated a non-taxable profit from dealings in its own stock of $436,581.21 which was carried on the books as a cash item in the surplus account in accordance with the taxpayer's understanding of the situation and the Treasury Department regulation in force at the time. It is stipulated that the amount of the item should be reduced to $286,581.21.

During a period of sixteen years from 1918 to 1934, the regulations, rulings, and decisions of the Treasury Department and the decisions of the Board of Tax Appeals supported the interpretation of the statute for which the taxpayer now contends. They were based upon the theory that when a corporation issues shares of its stock for the money or property of another person, or acquires such stock in exchange for its own money or property, there takes place a capital transaction which involves a readjustment of the capital structure, but neither a taxable gain nor a deductible loss. Thus the regulations in force during the period expressly declared that "a corporation realizes no gain or loss from the purchase or sale of its own stock";[5] the rulings and decisions of the Treasury Department were in harmony with this pronouncement;[6] and the

---

[5] Regulations 45, Arts. 542 and 563, Rev.Act of 1918; Regulations 62, Arts. 543 and 563, Rev.Act of 1921; Regulations 65, Arts. 543 and 563, Rev.Act of 1924; Regulations 69, Arts. 543 and 563, Rev.Act of 1926; Regulations 74, Arts. 66 and 176, Rev.Act of 1928; Regulations 77, Arts. 66 and 176, Rev.Act of 1932; Regulations 33, revised, Article 98 promulgated under the Revenue Acts of

September 8, 1916 and October 3, 1917 contained the statement that if treasury stock is resold at a price in excess of its cost upon repossession, such excess shall be returned as income.

[6] Law Opinion 296, 5 C.B. 210; Law Opinion 426, 5 C.B. 210; Law Opinion 1035, 2 C.B. 132, 133; Law Opinion 1035, revised, 3 C.B. 160, 162; A.R.R. 693, 5 C.B. 207; A.R.R. 799, C.B. I-1,

Board of Tax Appeals in a leading decision, Appeal of Simmons & Hammond Mfg. Co., 1925, 1 B.T.A. 803, held that a corporation which had 323 shares of stock outstanding experienced no deductible loss in the sale of 94 shares for less than the price at which they had been bought by the corporation a few months before.[7]

Writers upon the theory of accounting have given much consideration to the proper method of entering upon the records of a corporation purchases and sales by it of its own stock. It is quite generally said that stock purchased and held as treasury stock without retirement should not be treated as an asset but should be carried in the balance sheet as a reduction of capital or of surplus.[8] But it is freely admitted that the actual practice of many important businesses has been to the contrary;[9] and it has been suggested that the correct accounting for stock held in the treasury may be affected in a given case by attendant circumstances, as for instance, that the amount involved is small in comparison with the total stock outstanding, or that marketable stock is being temporarily held for resale, as indicating that from a practical standpoint the

374; A.R.R. 8159, C.B. III-2, 256; I. T. 1198, C.B. I-1, 275; I.T. 1736, C.B. II-2, 274; I.T. 1802, C.B. II-2, 267; Solicitor's Memorandum 2205, C.B. III-2, 244.

[7] To the same effect was Appeal of Co-operative Furniture Co., 2 B.T.A. 165. Similar rulings were made with regard to the purchase or sale by a corporation of its shares although at a price varying from that at which they had been previously issued or purchased by the corporation. Appeal of Atlantic Carton Corporation, 2 B.T.A. 380; Appeal of Hutchins Lumber & Storage Co., 4 B.T.A. 705; Appeal of Liberty Agency Co., 5 B.T.A. 778; J. H. Johnson v. Com'r, 19 B.T.A. 840, affirmed 5 Cir., 56 F.2d 58; American Cigar Co. v. Com'r, 21 B.T.A. 464, affirmed 2 Cir., 66 F.2d 425; Carter Hotel Co. v. Com'r, 25 B.T.A. 933, affirmed 4 Cir., 67 F.2d 642; Ohio Central Telephone Co. v. Com'r, 28 B.T.A. 96; and with regard to costs and expenses incurred in an issue of stock, Appeal of Emerson Electric Co., 3 B.T.A. 932; Simmons Co. v. Com'r, 8 B.T.A. 631, affirmed 1 Cir., 33 F.2d 75; and with regard to partial payments forfeited to the corporation upon default in the payment of the full purchase price of stock, Appeal of Illinois Rural Credit Ass'n, 3 B.T.A. 1178; Inland Finance Co. v. Com'r, 23 B.T.A. 199, affirmed 9 Cir., 63 F.2d 886; see, also, 105 W. 55th St., Inc., v. Com'r, 15 B.T.A. 210, affirmed 2 Cir., 42 F.2d 849.

The Board also applied the rule to the purchase by a corporation of the stock of an affiliated corporation, regarding them as a single entity under the statutes. Appeal of Farmers Deposit Nat. Bank, 5 B.T.A. 520; Appeal of Interurban Construction Co., 5 B.T.A. 529; Union Trust Co. of N. J. v. Com'r, 12 B.T.A. 688. Recently similar decisions of the Board have been reversed by the courts on the ground that affiliated corporations are separate entities in law. Commissioner v. Van Camp Packing Co., 7 Cir., 67 F. 2d 596; Commissioner v. General Gas & Elec. Corporation, 2 Cir., 72 F.2d 364; Founders General Corporation v. Commissioner, 2 Cir., 79 F.2d 6. The rule of the Board was also applied in the later cases when the transactions involved a transfer of property as well as stock. Houston Bros. Co. v. Com'r, 21 B.T.A. 804, overruling Behlow Estate Co. v. Com'r, 12 B.T.A. 1365 and New Jersey Porcelain Co. v. Com'r, 15 B.T.A. 1059; S. A. Woods Machine Co. v. Com'r, 21 B. T.A. 818. Cf. Haskell & Barker Car Co. v. Com'r, 9 B.T.A. 1087; see also Riggs Nat. Bank v. Com'r, 17 B.T.A. 615, affirmed Burnet v. Riggs Nat. Bank, 4 Cir., 57 F.2d 980. The decision of the Board in S. A. Woods Machine Company v. Com'r was reversed on appeal as will hereinafter appear.

[8] George S. Hills on Stated Capital and Treasury Shares, Journal of Accountancy, Vol. 57, Jan. to June, 1934, 202, 212, 213; Dickinson Accountancy Practice and Procedure, 130; Paton, Accountant's Hand Book, 931, 932, 980, 981; Wildman and Powell, Capital Stock Without Par Value, 93, 94; Marple Treasury Stock, Journal of Accountancy, Vol. 57, Jan. to June, 1934, 257, 262, 263; Sunley and Pinkerton, Corporation Accounting, 121; Kester, Accounting Theory and Practice, 17.

[9] See the articles by Hills and Marple, Supra. On May 10, 1938 the Federal Securities and Exchange Commission ruled that the excess of the proceeds of the sale of reacquired shares of a corporation's own stock over the cost thereof should be accounted for as capital since a transaction of this nature does not result in profit or surplus; and that from an accounting standpoint no distinction should be made between such a transaction and the reacquisition and retirement of such stock together with the subsequent issue of stock of the same class.

capital structure is not materially affected. This viewpoint has all along been held by Montgomery.[10]

When we come to the decisions of the courts we find support both for the view that treasury stock is in truth not an asset in the hands of a corporation; and also for the opinion that the real nature of the situation must be examined in order to determine whether gain or loss, recognizable by the taxing statutes, has occurred in the purchase or sale by a corporation of its own stock. Thus it was said by Judge Learned Hand in speaking of treasury shares in Borg v. International Silver Co., 2 Cir., 11 F.2d 147, 150:

"Such shares are of necessity retired in this sense: That they constitute no longer any liability of the defendant. A corporation can have no right of action against itself, as must be if the share is truly a liability. Indeed, the only difference between a share held in the treasury and one retired is that the first may be resold for what it will fetch on the market, while the second has disappeared altogether. * * * To carry the shares as a liability, and as an asset at cost, is certainly a fiction, however admirable. They are not a liability, and on dissolution could not be so treated, because the obligor and obligee are one. They are not a present asset, because, as they stand, the defendant cannot collect upon them. What in fact they are is an opportunity to acquire new assets for the corporate treasury by creating new obligations. In order to indicate this potentiality, it may be the best accounting to carry them as an asset at cost, providing, of course, all other assets are so carried. Even so, a com-

pany which revalued its assets might properly carry them at their sale value when the revaluation was made. In any event there can be no ambiguity in stating the facts more directly as the defendant did; that is, in treating the shares as not in existence while held in the treasury, except as a possible source of assets at some future time, when by sale at once they become liabilities and their proceeds assets. It makes no difference whether this satisfies ideal accounting or not."

The holding of the Board in S. A. Woods Machine Co. v. Commissioner, 21 B.T.A. 818, that in accordance with Regulations 65, Article 543, no taxable income resulted when a corporation accepted shares of its own stock in payment of damages due it for patent infringement was reversed in 1 Cir., 57 F.2d 635. Adopting the realistic view of the problem the court said (page 636):

"Whether the acquisition or sale by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction involved. Walville Lumber Co. v. Com'r of Internal Revenue (C. C.A.) 35 F.2d 445; Spear & Co. v. Heiner (D.C.) 54 F.2d 134. If it was in fact a capital transaction, i. e., if the shares were acquired or parted with in connection with a readjustment of the capital structure of the corporation, the Board rule applies. Doyle v. Mitchell Bros. Co., 247 U.S. 179, 184, 38 S.Ct. 467, 62 L.Ed. 1054; Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. But where the transaction is not of that character, and a corporation has legally dealt in its own stock as it might in the shares of an-

---

[10] Montgomery, Auditing Theory and Practice, 4th Ed. 1927, 245, 347. In the 5th Ed. 1934, 402, the author stated: "Proceeds of Sale of Treasury Stock. —When capital stock is donated to a corporation, the proceeds of its subsequent sale are capital. In the author's opinion, provided the laws of the state of incorporation permit, when stock is purchased in the open market and resold, the profit or loss may be reflected in earned surplus since in such a case there is virtually no difference between dealing in its own stock and in the stocks or securities of other corporations. It has been urged that when a corporation purchases part of its stock, it is a capital transaction because its outstanding stock is reduced and its surplus increased or decreased; if stock is purchased below par, surplus is

increased; if stock is purchased above par, surplus is reduced. When stock is purchased or acquired for permanent holding or for formal reduction of outstanding issues, it is proper to treat it as a capital transaction; but when a corporation buys a relatively small number, say 100 shares, of its own stock at $80. a share and immediately sells it for $90. a share, the gain of $1,000 is no more a capital gain than if the purchase and resale were of any other security or commodity." See, also, Sunley and Pinkerton on Corporate Accounting, 123, 124; Dickinson, Accountancy Practice and Procedure, 117; R. E. Payne on Treasury or Reacquired Stock in the Certified Public Accountant February, 1936, Vol. 16, 98-105; Esquerre, Practical Accounting Problems, Part II, 1922, 6-81.

other corporation, and in so doing has made a gain or suffered a loss, we perceive no sufficient reason why the gain or loss should not be taken into account in computing the taxable income. The view taken by the Board of Tax Appeals (see Houston Brothers Co. v. Commissioner, 21 B.T.A. 804) presses accounting theory too far in disregard of plain facts. It is not supported by any decision which has come to our attention except those of the Board. * * *

"The transaction involved in this case was equivalent to the payment of the debt in cash and the investment of the proceeds by the corporation in its own stock. If that had been done clearly the cash received would have been taxable income. The transaction was not changed in its essential character by the fact that, as the debtor happened also to own the stock, the money payment and the purchase of stock were by-passed, and the stock was directly transferred in payment of the debt. The stock was the medium in which the debt was paid. The wide door to evasion of taxes opened by the decision of the Board is an additional reason, and a weighty one, against it."

See, also, Commissioner v. Boca Ceiga Development Co., 3 Cir., 66 F.2d 1004; Allyne-Zerk Co. v. Commissioner, 6 Cir., 1936, 83 F.2d 525; Dorsey Co. v. Commissioner, 5 Cir., 1935, 76 F.2d 339, certiorari denied 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed. 416; Burnet v. Riggs Nat. Bank, 4 Cir., 1932, 57 F.2d 980. See, also, the comment on Taxability of Transactions by a Corporation in Its Own Stock, 47 Yale L.J. 111.

It is manifest that the decision of the court in S. A. Woods Machine Co. v. Commissioner, supra, led to the promulgation of the amended regulation by the Secretary of the Treasury which now appears as Regulations 77, Article 66, wherein the Board revised its former position and adopted the view that "whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction which is to be ascertained from all its facts and circumstances; * * * and "where a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another." [11]

Enough has been said to suggest that neither interpretation of the Act is without a reasonable basis. On the one hand, it is reasonable to say that when a corporation buys or sells its own stock, a change in its capital structure takes place; and that the change may be of material significance although purchases are followed by sales, if substantial amounts of stock are involved and the stock is held in the treasury for substantial periods of time. On the other hand it may be said that the increase or decrease of net resources which often accompanies the purchase and sale of marketable stock bears strong resemblance to the gain or loss which the taxing statutes recognize; and this appears to be the more manifest when the change in the amount of outstanding stock is relatively small and the period during which it is held by the corporation as treasury stock is short. There is room for debate, and this situation determines the rationale of our decision in the pending case.

We do not undertake to say that the present regulation would not have been a correct interpretation of the statute, as applied to such facts as are now before us, if it had been promulgated in 1918. But, as we have seen, the prevailing opinion in that year and thence continuously until 1934 forbad the taxation of such a profit as the Tobacco Company earned in 1929 in the sale of its own stock; and Congress in the light of this interpretation of its intent reenacted in substantially the same words the definition of income subject to tax in five successive carefully considered revenue acts. Our path is therefore clear; for the rule is well settled that if a statute is reasonably susceptible of two constructions, its reenactment after an interpretative ruling by responsible officials amounts to a legislative sanction of the course pursued. Es-

---

[11] The change had perhaps been foreshadowed in Houston Brothers Co. v. Commissioner, 21 B.T.A. 804, 815, upon which the conclusion reached by the Board on the same day in S. A. Woods Machine Company v. Com'r, supra, was based, when the Board expressly declined to decide what rule should be applied in the case of a casual purchase and sale in the open market by a corporation of its own shares, nothing more being intended or accomplished than a temporary holding of the stock.

pecially is this true when the construction has been long maintained and several re-enactments of the language in dispute have taken place. The rule has been frequently applied in cases under the revenue acts when the statutory language is in general terms and susceptible of different interpretation as applied to the relevant facts; and in Johnson v. Commissioner, 5 Cir., 1932, 56 F.2d 58, it was applied to the very regulation now under consideration as set out in Regulations 62, Article 543 relating to the Revenue Act of 1921. See, also, United States v. Alabama Great Southern Ry. Co., 142 U. S. 615, 12 S.Ct. 306, 35 L.Ed. 1134; Copper Queen Consol. Mining Co. v. Territorial Board of Arizona, 206 U.S. 474, 27 S.Ct. 695, 51 L.Ed. 1143; United States v. Cerecedo, 209 U.S. 337, 28 S.Ct. 532, 52 L.Ed. 821; Brewster v. Gage, 280 U. S. 327, 50 S.Ct. 115, 74 L.Ed. 457; Mc-Feely v. Helvering, Com'r, 296 U.S. 102, 56 S.Ct. 54, 80 L.Ed. 83, 101 A.L.R. 304; Helvering v. Richmond, F. & P. R. Co., 4 Cir., 90 F.2d 971.

In Massachusetts Mutual Life Ins. Co. v. United States, 288 U.S. 269, 273, 53 S. Ct. 337, 339, 77 L.Ed. 739, the court said:

"The Congress in the Revenue Acts of 1928 and 1932 re-enacted Section 245 without alteration. This action was taken with knowledge of the construction placed upon the section by the official charged with its administration. If the legislative body had considered the Treasury interpretation erroneous, it would have amended the section. Its failure so to do requires the conclusion that the regulation was not inconsistent with the intent of the statute (National Lead Co. v. United States, 252 U.S. 140, 146, 40 S. Ct. 237, 64 L.Ed. 496; Poe v. Seaborn, 282 U.S. 101, 116, 51 S.Ct. 58, 75 L.Ed. 239; McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 492, 51 S.Ct. 510, 75 L.Ed. 1183; Costanzo v. Tillinghast, 287 U.S. 341, 53 S.Ct. 152, 77 L.Ed. 350), unless, perhaps, the language of the act is unambiguous and the regulation clearly inconsistent with it. Compare Louisville & N. R. Co. v. United States, 282 U.S. 740, 757, 758, 51 S.Ct. 297, 75 L.Ed. 672." Cf. Manhattan Co. v. Commissioner, 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L. Ed. 528; Koshland v. Helvering, 298 U.S. 441, 446, 56 S.Ct. 767, 769, 80 L.Ed. 1268, 105 A.L.R. 756; Burnet v. S. & L. Bldg. Corporation, 288 U.S. 406, 53 S.Ct. 428, 77 L.Ed. 861; Murphy Oil Co. v. Burnet,

287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318; Helvering v. Safe Deposit & Trust Co., Executor of Will of Henry Walters, 4 Cir., 95 F.2d 806.

The decision of the Board of Tax Appeals is reversed.