**UNITED STATES v. BRONSON et al.**

No. 39.

Circuit Court of Appeals, Second Circuit.

Dec. 14, 1944.

Robert E. Manley, of New York City, for appellant.

Thomas F. Murphy, James B. M. McNally, U. S. Atty., and David Hartfield,

Jr., Asst. U. S. Atty., all of New York City (Irving J. Galpeer, Atty., Securities and Exchange Commission, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us upon appeals by Bronson and two companies—Coronado Development Corporation and Wetherbee Process Corporation—from a judgment of conviction upon thirteen counts of an indictment in twenty counts. The first seven counts on which the appellants were convicted were the usual charges for using the mails to defraud; another count —Fifteen—was for the same crime, though it was laid under the Securities Act of 1933, 15 U.S.C.A. § 77q.; four counts— Sixteen, Seventeen, Eighteen and Nineteen—were for using the mails for the distributions of securities, not registered as required under that act; and the last —Count Twenty—was for a conspiracy to commit the crimes charged in the earlier counts. Bronson was sentenced to eighteen months imprisonment under each count, the sentences to run concurrently; he was also sentenced to pay a fine of $1,000 under each of Counts One, Five and Fifteen, and a fine of $2,000 under Count Twenty. The Coronado company was sentenced to pay a fine of $1,000 under Count One, a fine of $1,000 under Count Five, a fine of $1,000 under Count Fifteen, a fine of $2,000 under Count Twenty, and a fine of one dollar upon each of the other counts. The Wetherbee company was sentenced to pay a fine of one dollar on each count, and the fine was "remitted." We will take up the appeal of Bronson first. He complains: first, that the evidence was insufficient to sustain the verdicts; second, that the prosecution should not have been allowed to sever the trial as to a co-defendant, Thomas; third, that there were numerous errors in admitting and excluding evidence and in the court's charge. The most important of these errors is the first, to the understanding of which it is necessary to state the evidence at some length.

In 1927 Bronson was a director of, and the owner of a number of shares in, a copper company in Arizona, known as the Arizona Bagdad Corporation, which in that year was reorganized as the Bagdad Copper Corporation. The Arizona company transferred all its assets to the Bagdad company in exchange for 4,000,000 of that company's one dollar shares, which were issued to the shareholders of the Arizona company, who, as part of the same transaction, returned 2,800,000 shares to the Bagdad company, to be held as "treasury shares." The business did not prosper, and by 1930 the Bagdad company had substantially shut down the mine. However, in the autumn of 1935 Bronson and a mining engineer, named Thomas, conceived the notion of reviving it, and set about getting the necessary funds by the sale of stock. This they proposed to do in an exceedingly roundabout way. Bronson had already organized two other corporations, the other appellants at bar: the Coronado company and the Wetherbee company. The Wetherbee company was a mere shell; the Coronado company was a holding company for Bronson and his family, and was completely under his control; it held some of his Bagdad shares. On March 31, 1935, the Bagdad company reduced its capital from 4,000,000 to 800,000 shares, but increased the par value from $1 to $5. After this change the "treasury shares" were 340,000, and the holdings of the Coronado company were 65,000. Bronson then arranged with a broker, named Phillips, for a stock selling drive. For this he prepared as follows. In December, 1935, the Coronado company agreed to sell to Phillips 13,700 shares of Bagdad stock at $2.20 a share, for which Phillips was to pay by March 31st. On January 28, 1936, the Wetherbee company agreed to pay from the Bagdad company, at $2.20 a share, 13,756 shares, which that company had purchased in the market and held in its treasury. The Wetherbee company was to pay for these shares by March 13th, and, if it did, it would get an option from the Bagdad company, good until January 13, 1937, to buy 140,000 of that company's "treasury shares" at prices varying from $3 to $7. Phillips then paid the Coronado company the purchase price of the 13,700 shares of stock, and the Coronado company turned about and lent this money to the Wetherbee company. That company thereupon paid the borrowed money to the Bagdad company to take up its own purchase of 13,576 shares; pledged the shares to the Coronado company for the loan, and delivered them to the Coronado company which held them thereafter. Since this

purchase was a performance of the Wetherbee company's contract with the Bagdad company, the Wetherbee company became entitled to purchase the 140,000 of the new company's "treasury shares" under the option. (Incidentally the Coronado company was entitled to half of the optioned shares in the case of any default by the Wetherbee company upon the loan.) At the end of all these transactions Phillips had therefore 13,700 shares of the Bagdad shares; the Coronado company held 13,756 shares as pledgee which came from the Bagdad company's treasury; and the Wetherbee company had an option upon 140,000 other shares of Bagdad "treasury stock." These optioned shares the Wetherbee company then agreed to sell Phillips: 50,000 at $4; 50,000 at $3.50; 40,000 at $7—the same prices as those fixed in the contract between itself and the Bagdad company.

So armed, Phillips began to sell the 13,700 of Bagdad shares in December, 1935; but he had not disposed of many before January 27, 1936. By that time he had, however, put up the market price from less than $2 to $3.75; and by the end of March he had succeeded in selling all the shares at average prices well over $4, and at times as high as $4.50. Although these shares all came from the Coronado company, as we have seen, the result was the same as though they had come directly from the treasury of the Bagdad company; for, when Phillips took them from the Coronado company, that company as pledgee got the same number—13,756 to be accurate—from the Bagdad company through the Wetherbee company, which, even more than the Coronado company, was a mere dummy of Bronson. After he had sold these 13,700 shares, Phillips began selling from the 140,000 optioned shares, the right to which the Wetherbee company had transferred to him, as we have said. The first 50,000 he sold during April, May, June, and the first ten days of July; for these the Bagdad company received $3 a share. Phillips's prices averaged a little over $4 in April, about $4.50 in May, about $6 in June, and $7 for July. He then sold 25,000 of the second instalment of the optioned shares, for which he paid $3.50 to the Bagdad company. His prices for these were between $7 and $8.50 a share, until in July, 1936, an investigation of the Securities and Exchange Commission caused him to stop.

Bronson had been privy to this whole plan, as is indeed obvious from its structure; indeed, the jury might have found that he had devised it. The buyers of all these shares did not of course know that they were buying shares which—after the paraphernalia of contracts and dummy companies was cleared away—came out of the Bagdad treasury; and Phillips and Bronson naturally did not tell them. The spread between the price received by the Bagdad company and what they paid was also of course unknown to them. There was also testimony that Bronson went much further than this; that on several occasions he affirmatively declared that the shares were not "treasury stock": once, in a letter to a customer, named Luckeish; a second time, in a statement to a broker, named Banigan; a third, in answer to an inquiry made at a hearing of the Pennsylvania Securities Commission. So much for the stock selling.

The Bagdad company issued a balance sheet of its assets as of December 31, 1935, which was distributed during the drive. On this the current assets were about $157,000, of which about $22,000 were in cash and bonds, $3,300 in supplies, and $131,000 were set down as "Other Securities at Cost." This item was in two parts: the 13,700 shares of Bagdad stock, which later went to the Coronado company, and an investment in a rolling mill in Sandusky, Ohio. On March 12, 1936, Bronson wrote to his engineer, Thomas, that the Sandusky mill should have been written off altogether, its value having disappeared; yet in May, 1936, he told one Mellgren—of whom more later—that the item of $31,000 had been composed of securities in the Anaconda and Kennecott companies, which had since been turned into cash; and at the same time he also told him that the investment in the Sandusky rolling mill would show a loss of about $40,000.

A firm of brokers,—Charles H. Jones & Co.—became interested in selling Bagdad shares, but wished information about the company and the mine, and applied to Bronson. At his suggestion, their employe, Mellgren, went to Arizona, where he spent three days at the mine. Thomas, the engineer on the spot, showed him about, and it was from Thomas that he got a greater part of the material, which he afterwards put into a report to Banigan. He

swore that Thomas had told him, as he reported, that for the last six months the mine had devoloped two veins from which there was immediately available 140,000 tons, averaging from three to four per cent of ore, and that it was estimated that there were 680,000 more tons between these veins, which would average between two and two and one-half per cent. Another statement in the report, which Mellgren said that he also took from Thomas, was that measures were being taken to treat ore, averaging probably three per cent, possibly four per cent, in an enlarged plant. The prosecution called a mining expert, who had visited the mine, and examined it and the records of the company. He swore that only 45,000 tons had been developed, whose content ranged between 3.74 and about 2 per cent; and that the ore treated during the first six months of 1936 did not average "anywhere near three to four per cent."

Bronson and Thomas were in constant communication; their letters disclose relations of great intimacy, from which a jury would have been forced to conclude that they had no secrets from each other. One passage is of enough importance to justify some detailed consideration, for it admitted of, if indeed it did not demand, a sinister interpretation, when read in the light of what followed. On January 8, 1936, Bronson wrote: "I have been thinking that on that car of direct high grade, I would like to see it sorted to as high grade as possible, so that we can photograph the check and smelter settlement sheet showing the grade. One time at Calavada we sold $80,000 worth of stock on the strength of one car of 18% ore." In the spring of 1936, one, Yarnell, a stockbroker having customers for Bagdad stock, talked with Phillips, who told him that he would get Yarnell more information; and from time to time Phillips either telephoned or wrote to Yarnell's company. On the basis of information so received, Yarnell issued a sales bulletin to his employees on April 7th, in which he referred to a copy of an assay of a carload of ore at better than 27% copper. He told Phillips that this sounded very high in percentage, and asked him whether it was not handpicked, which Phillips denied. As we have just said, no records of the company justified the suggestion that the run of the mine approached anywhere near 27%. The character of the information which

both men understood was to be given Mellgren is also illuminated by the following passages from Bronson's letters. On May 20, 1936, he wrote that he understood Mellgren had returned, and "is bullish as can possible" (sic) "be. So you must have put on the heat!" Three days later: "When you see Mellgren's report there will be no more stock for sale! He was over yesterday and read it to me, and it's some optimistic picture."

 From the foregoing evidence there can be not the least question that a jury was justified in finding a verdict against Bronson upon all the counts for fraud and upon that for conspiracy. The particular instances which we have recited, aside from the scheme as a whole, would alone have been enough. His letters to Thomas of themselves marked him as an irresponsible and cunning stock manipulator, ready to resort to deceptive market devices. As is usual in such cases, we are urged—incidentally in a brief whose length and prolixity only serves to confuse the reader—to substitute ourselves for the jury and try the merits over again. We shall not labor the point that this we cannot do; but we do wish to emphasize that the established character of the scheme was alone enough to condemn it. As we have already said, all the shares sold were either formally "treasury stock", or its equivalent. Had they been shares of a new issue, put upon the market for the first time, there could be no possible doubt. It would be a misrepresentation to sell such shares as though they were part of the outstanding authorized capital; nobody buying shares on a market through brokers, supposes that he is getting a new issue. And that misrepresentation would be a fraud, because nobody who knew that the shares were a new issue would be willing to pay more than what the company was to get, plus a fair commission. To work up such shares upon a rising market, which bears no relation to the amount paid to the company, involves at least a suppression of the truth which courts have often condemned. Strong v. Repide, 213 U.S. 419, 430, 29 S.Ct. 521, 53 L.Ed. 853; United States v. Brown, 2 Cir., 79 F.2d 321, 325; Coplin v. United States, 9 Cir., 88 F.2d 652, 658; Charles Hughes & Co. v. Securities & Exchange Commission, 2 Cir., 139 F.2d 434, 437. We infer, though the matter is left obscure, that Bronson would not deny this, but that he asserts that the shares in this

case were not a new issue, but a part of the outstanding authorized capital, which it was permissible to sell like other shares, for whatever one could get. But "treasury shares" are the same as a new issue for the purposes with which we are here concerned; the only difference is that their reissue does not require any change in the charter. Whether a share of stock be regarded as no more than a chose in action, or as having in addition some diaphanous proprietary quality, when the corporation buys it in, it ceases to have any legal existence. So far as touches shareholders, the outstanding capital has been decreased, and the aliquot interest of every shareholder has been increased, precisely as though the shares had been formally retired. Borg v. International Silver Co., 2 Cir., 11 F.2d 147, 150; R. J. Reynolds Tobacco Co. v. Commissioner of Internal Revenue, 4 Cir., 97 F.2d 302, 307; E. R. Squibb & Sons v. Helvering, 2 Cir., 98 F.2d 69, 70. It is irrelevant here that for purposes of taxation there may be a difference between "retired" and "treasury" shares. Amelia H. Cohen Trust v. Commissioner of Internal Revenue, 3 Cir., 121 F.2d 689; Alpers v. Commissioner of Internal Revenue, 2 Cir., 126 F.2d 58.

■■ The only other question of importance is the severance of the trial against Thomas, who was at the time in Newfoundland, employed in a mine whose continued operation was thought to be important for the prosecution of the war. No accused person has any recognizable legal interest in being tried with another, accused with him, though he often has an interest in not being so tried; but he may of course have a lively interest in securing the attendance at the trial as a witness of another accused. The denial of that interest is all that Bronson may invoke here; and it is in substance, what he does invoke, when he asserts that it was unfair to force him to trial while Thomas was not available to him as a witness. If Thomas would have claimed his privilege upon the trial, Bronson of course lost nothing by his absence. If he would not—as at one stage of the proceedings an attorney who appeared for him said that he would not—Bronson lost whatever advantage his personal appearance on the stand would have had over his deposition; and nobody can tell whether he would have impressed the jury more favorably than Bronson himself. So far as that was

a prejudice, it is inevitable whenever an accused person wishes to call a witness who is beyond reach of the court's writ. Was that a prejudice which demanded the continuance of the cause until Thomas could be spared to come to New York? The indictment concerned events which had all happened before August, 1936; it had not been found until March 8, 1939, only five months before the statute would have run. The cause first came on for trial on April 20, 1942, when, out of consideration for Bronson, it was adjourned for six months, so that the Newfoundland mining company might find a substitute for Thomas. It came on again on November 2, 1942, and was again put over, this time till January, 1943; and it was put over a third time till April 8, 1943. Still, Thomas could not be spared; and there was no probability that he ever could be while the war was on. The war is still on, and if Bronson had succeeded, the span between the events charged in the indictment and the trial might well have been nine years or more. It was within the discretion of the court not to imperil the prosecution by a delay of two more years, in order to allow Thomas to appear.

■■ A final argument is that it was impossible to prepare proper questions for a deposition in advance of the trial. There is small reason to believe so. Bronson's attorney declared in an affidavit made in October, 1942, that he had already "prepared for his examination over 150 pages of material." The two men had remained friendly, so far as appears, and Thomas was needed to testify only to what took place at the mine. The charges in the indictment were detailed and the evidence actually introduced did not go beyond them; we cannot understand why, with a year in which to do so, it was impossible by correspondence to learn what Thomas would say and to frame adequate interrogatories. Finally, it is scarcely necessary to add that Bronson got no privilege, because of Thomas's absence, to put in evidence the affidavits used upon the motions, or the correspondence between them except as these were independently competent.

■■ There remain only the supposed errors in the admission and rejection of evidence and in the charge. The principal complaint is of the admission of some of Bronson's letters to Thomas: this upon two grounds; that they were remote in time,

and were not part of the execution of the scheme. It is true that some letters were as early as 1928, and did not concern the transactions under examination upon the trial; but Bronson argues that Thomas was not his confederate at all, and it is curious indeed that, in the face of such a position, he should assert that letters between them are irrelevant, which might disclose what their relations were, even though they were written seven or eight years earlier. As to the second objection, the admissions of Bronson were competent against him, like any others of an accused person, regardless of whether they were in execution of the scheme. The doctrine relied upon governs only their competence against co-conspirators. We shall not concern ourselves with the evidence relating to Counts Sixteen, Seventeen, Eighteen and Nineteen, for reasons we shall give in a moment. The other supposed errors in the treatment of evidence could not conceivably result in reversal, where the trial was so long, especially since guilt was so clear: we shall not discuss them. The exceptions to the colloquial charge all concerned Counts Sixteen, Seventeen, Eighteen and Nineteen; the exceptions to the refusals to charge, so far as they concern the counts for fraud, are altogether insubstantial. The judge very carefully went over all the allegations of the indictment, and discussed the evidence with scrupulous impartiality; the requested instructions would have added nothing to the jury's enlightenment.

■ We disregard Counts Sixteen, Seventeen, Eighteen and Nineteen, not because we have doubts as to the correctness of the verdicts upon them, but because it is unnecessary to pass upon them. The sentences were concurrent upon all the counts, and were in no case greater than was permissible under the counts we have affirmed.

Under well-settled law in such a situation an appellate court need not go beyond the counts necessary to support the sentence. Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173; Pierce v. United States, 252 U.S. 239, 252, 40 S. Ct. 205, 64 L.Ed. 542; Brooks v. United States, 267 U.S. 432, 441, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Whitfield v. Ohio, 297 U.S. 431, 438, 56 S.Ct. 532, 80 L.Ed. 778.

■ The foregoing requires us to affirm the judgment against Bronson. As to that against the Coronado company, it is true that some of the evidence was admitted against Bronson alone, but there was enough, with that left out, to support the verdicts, and indeed, there could be no real distinction in any event between the company's guilt and his. On the other hand the judge fined the company one dollar on each of Counts Sixteen, Seventeen, Eighteen and Nineteen, and strictly speaking, this would require us to determine the validity of the verdicts on these counts. However, the stake is so trifling that, unless the parties insist, we shall not do so. The same would be true as to the Wetherbee company also, except that, although the judge also fined it one dollar on these counts he at the same time "remitted" these fines, as indeed he "remitted" all its fines. We are not sure that we understand what he meant; but we interpret his action as recalling the fines altogether. If so, the result was not to suspend sentence, for he did not hold the case open for future action, but professed finally to dispose of it. Rather it was a failure to impose any kind of sentence whatever; and for that reason we see nothing for it but to dismiss the appeal.

Judgment against Bronson and the Coronado Company affirmed; appeal of the Wetherbee Company dismissed.